[No. S006188. Jan. 29, 1990.]

CITY OF SACRAMENTO et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

54

**COUNSEL**

James P. Jackson, City Attorney, and William P. Carnazzo, Deputy City Attorney, for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, Paul H. Dobson, Richard M. Frank, Floyd D. Shimomura and Carol Hunter, Deputy Attorneys General, for Defendants and Respondents.

De Witt W. Clinton, County Counsel (Los Angeles), Amanda F. Susskind, Deputy County Counsel, Kitt Berman, Ross & Scott and William D. Ross as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**EAGLESON, J.**—In response to changes in federal law, chapter 2 of the Statutes of 1978 (hereafter chapter 2/78) extended mandatory coverage under the state's unemployment insurance law to include state and local governments and nonprofit corporations. Here we consider whether, in chapter 2/78, the state "mandate[d] a new program or higher level of service" on the local agencies, and must therefore reimburse local compliance costs under article XIII B of the California Constitution and related statutes.

We conclude that the state is *not* required to reimburse the chapter 2/78 expenses of local governments. The obligations imposed by chapter 2/78 fail to meet the "program" and "service" standards for mandatory subvention we recently set forth in *County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46 [233 Cal.Rptr. 38, 729 P.2d 202] (hereafter *County of Los Angeles*). Chapter 2/78 imposes no "unique" obligation on local governments, nor does it require them to provide new or increased governmental services to the public. The Court of Appeal decision, finding the expenses reimbursable, must therefore be reversed.

However, our holding does not leave local agencies powerless to counter the fiscal pressures created by chapter 2/78. Though provisions of the Revenue and Taxation Code limit local property tax levies, and article XIII B itself places spending limits on both state and local governments, "costs mandated by the federal government" are expressly excluded from these ceilings. Chapter 2/78 imposes such "federally mandated" costs, because it was adopted by the state under federal coercion tantamount to compulsion. Hence, subject to overriding limitations on taxation rates (see, e.g., Cal. Const., art. XIII A), both state and local governments may levy and spend for their chapter 2/78 coverage obligations without reduction of the fiscal limits applicable to other needs and services.

## I. FACTS.

In 1972, and again in 1973, the Legislature enacted comprehensive schemes for local property tax relief. Though frequently amended thereafter, these statutes retained three principal features. First, they placed a limit on the local property tax rate. Second, they required the *state* to reimburse local governments for their costs resulting from state laws "which mandate . . . new program[s] or . . . increased level[s] of service" at the local level. Finally, they allowed local governments to exceed their property taxation limits to fund certain other nondiscretionary expenses, including "costs mandated by the federal government." (Stats. 1972, ch. 1406, § 14.7, pp.

2961-2967; Stats. 1973, ch. 358, § 3, pp. 783-790; Rev. & Tax. Code, §§ 2206, 2260 et seq., 2271; former §§ 2164.3, 2165, 2167, 2169, 2207, 2231; Gov. Code, § 17500 et seq.)

Since adoption of the Social Security Act in 1935, federal law has provided powerful incentives to enactment of unemployment insurance protection by the individual states. In current form, the Federal Unemployment Tax Act (hereafter FUTA) (26 U.S.C. § 3301 et seq.) assesses an annual tax upon the gross wages paid by covered private employers nationwide. The tax rate, which has varied over the years, stands at 6.2 percent for calendar year 1990. (26 U.S.C. §§ 3301(1), 3306.) However, employers in a state with a federally "certified" unemployment insurance program may credit their contributions to the state system against up to 90 percent of the federal tax (currently computed at 6 percent for this purpose). (*Id.*, §§ 3302-3304.) A "certified" state program also qualifies for federal administrative funds. (42 U.S.C. §§ 501-503.)

California enacted its unemployment insurance system "on the eve of the adoption of the Social Security Act" in 1935 (*Steward Machine Co.* v. *Davis* (1937) 301 U.S. 548, 587-588 [81 L.Ed. 1279, 1291-1292, 57 S.Ct. 883, 109 A.L.R. 1293]; see Stats. 1935, ch. 352, § 1 et seq., p. 1226 et seq.) and has sought to maintain federal compliance ever since. Every other state has also adopted an unemployment insurance plan in response to the federal stimulus.

In 1976, Congress enacted Public Law number 94-566 (hereafter Public Law 94-566). Insofar as pertinent here, Public Law 94-566 amended FUTA to require for the first time that a "certified" state plan include coverage of the employees of public agencies. (Pub.L. No. 94-566 (Oct. 20, 1976) § 115(a), 90 Stat. 2670; 26 U.S.C. §§ 3304(a)(6)(A), 3309(a); see 26 U.S.C. § 3306(c)(7).) States which did not alter their unemployment compensation laws accordingly faced loss of the federal tax credit and administrative subsidy.

The Legislature thereafter adopted chapter 2/78 to conform California's system to Public Law 94-566. Among other things, chapter 2/78 effectively requires the state and all local governments, beginning January 1, 1978, to participate in the state unemployment insurance system on behalf of their employees. (Stats. 1978, ch. 2, §§ 12, 24, 31, 36.5, 58-61, pp. 12-14, 16, 18, 24-27; Unemp. Ins. Code, §§ 135, subd. (a), 605, 634.5, 802-804.)

In November 1979, the voters adopted Proposition 4, adding article XIII B to the state Constitution. ■ ■ ■ ■ Article XIII B—the so-called "Gann limit"—restricts the amounts state and local governments may

appropriate and spend each year from the "proceeds of taxes." (§§ 1, 3, 8, subds. (a)-(c).)[1] In language similar to that of earlier statutes, article XIII B also requires state reimbursement of resulting local costs whenever, after January 1, 1975, "the Legislature or any state agency mandates a new program or higher level of service on any local government, . . . ." (§ 6.) Such mandatory state subventions are excluded from the local agency's spending limit, but included within the state's. (§ 8, subds. (a), (b).) Finally, article XIII B excludes from either the state or local spending limit any "[a]ppropriations required for purposes of complying with mandates of the courts *or the federal government* which, *without discretion,* require an expenditure for additional services or which *unavoidably* make the providing of existing services more costly." (§ 9, subd. (b) [hereafter section 9(b)], italics added.)

The City of Sacramento (City) and the County of Los Angeles (County) filed claims with the State Board of Control (Board) (see Rev. & Tax. Code, former § 2250 et seq.; see now Gov. Code, § 17550 et seq.) seeking state subvention of the costs imposed on them by chapter 2/78 during 1978 and portions of 1979. The Board denied the claims, ruling that chapter 2/78 was an enactment required by federal law and thus was not a reimbursable state mandate. On mandamus (Code Civ. Proc., § 1094.5; Rev. & Tax. Code, former § 2253.5; see now Gov. Code, § 17559), the Sacramento Superior Court overruled the Board and found the costs reimbursable. The court ordered the Board to determine the amounts of the City's and the County's individual claims, and also to adopt "parameters and guidelines" to be applied in determining "these . . . and other claims" arising under chapter 2/78. (Rev. & Tax. Code, former § 2253.2; see now Gov. Code, §§ 17555, 17557.)[2]

In *City of Sacramento* v. *State of California* (1984) 156 Cal.App.3d 182 [203 Cal.Rptr. 258] (hereafter *Sacramento I*), the Court of Appeal affirmed. Among other things, the court concluded (pp. 194-199) that chapter 2/78

---

[1] Article XIII B is to be distinguished from article XIII A, which was adopted as Proposition 13 at the June 1978 election. Article XIII A imposes a direct constitutional limit on state and local power to *adopt and levy taxes.* Articles XIII A and XIII B work in tandem, together restricting California governments' power both to levy and to spend for public purposes. Moreover, to the extent "federally mandated" costs are exempt from prior *statutory* limits on local *taxation* (see *ante,* at pp. 57-58), article XIII A eliminates the exemption insofar as it would allow levies in excess of the constitutional ceiling.

All further section references are to article XIII B of the California Constitution, unless otherwise indicated.

[2] The claims for reimbursement were originally premised entirely on Revenue and Taxation Code section 2201 et seq. While the City's and the County's mandamus petitions were pending in superior court, article XIII B was adopted. The City and the County amended their petitions to include article XIII B as an additional basis for relief, and the case proceeded accordingly.

imposed *state*-mandated costs reimbursable under section 6 of article XIII B, since the potential loss of federal funds and tax credits did not render Public Law 94-566 so coercive as to constitute a "[*mandate*] . . . of the *federal* government" under section 9(b). (Italics added.) We denied hearing.

On remand, the Board determined the amounts due on the claims originally submitted by the City and the County. As required by the judgment, the Board also adopted "parameters and guidelines" for reimbursement of chapter 2/78 costs to all affected local agencies. However, during the 1984 session of the Legislature, no bills were introduced for reimbursement of pre-1984 costs, and bills to fund costs in and after 1984 failed passage.

From and after the decision in *Sacramento I,* the City paid "under protest" its quarterly billings from the Employment Development Department (EDD) for unemployment compensation. Each payment included a claim for refund of unemployment taxes pursuant to Unemployment Insurance Code section 1176 et seq. EDD responded to the refund claims by referring the City to its statutory subvention remedies.

Accordingly, in July 1985, the City began returning its quarterly billings unpaid. It thereupon commenced the instant class action in Sacramento Superior Court on behalf of all local governments in the state. Named as defendants were the State of California, the Governor, EDD, the state Controller and Treasurer, and the Legislature. The complaint sought (1) injunctive and declaratory relief barring enforcement of chapter 2/78 in the absence of state subvention; (2) a writ of mandate directing that past, current, and future subvention funds be appropriated and disbursed, and/or that EDD pay local agencies' past, current, and future unemployment-insurance contributions from its own budget; and (3) damages for past failures to reimburse.

Shortly after this suit was filed, the Legislature appropriated some chapter 2/78 funds for fiscal year 1984-1985 (Stats. 1985, ch. 1217, §§ 12, 17, subd. (b), pp. 4148, 4150), and it subsequently authorized limited funds in the 1986 Budget Act (Stats. 1986, ch. 186, § 2.00, p. 1006). On defendants' demurrer, the trial court later dismissed plaintiffs' claims for reimbursement for these post-1984 periods.[3] Thereafter, the trial court certified the suit as a class action and granted plaintiffs' motion for summary adjudication of issues based on *Sacramento I.*

---

[3] The trial court also sustained the Legislature's demurrer without leave to amend and dismissed the Legislature as a party defendant. The Court of Appeal affirmed the dismissal in a separate proceeding. (See *City of Sacramento* v. *California State Legislature* (1986) 187 Cal.App.3d 393 [231 Cal.Rptr. 686].)

While the case remained pending at the trial level, we decided *County of Los Angeles.* There we held that article XIII B, and earlier subvention statutes, requires state reimbursement *only* when the state compels local governments to provide new or upgraded "programs that carry out the governmental function of providing *services to the public,* or . . . , to implement a state policy, [the state] impose[s] *unique* requirements on local governments [that] do not apply generally to all residents and entities in the state." (43 Cal.3d at p. 56, italics added.)

Defendants in this case thereupon moved for summary judgment, urging that extension of unemployment insurance coverage to public employees satisfied neither reimbursement standard set forth in *County of Los Angeles.* The trial court agreed and awarded summary judgment.

The Court of Appeal reversed on two independent grounds. First, the court ruled that defendants were collaterally estopped by *Sacramento I* to relitigate the reimbursability of chapter 2/78 costs. Second, the court found that chapter 2/78 imposed "unique requirements" on local governments, within the meaning of *County of Los Angeles,* since the legislation was aimed solely at local agencies and subjected them to obligations from which they were previously exempt.

## II. JURISDICTION; PLAINTIFFS' EXHAUSTION OF REMEDIES.

■ After we granted review, we asked the parties and amici curiae[4] to brief whether the current suit is jurisdictionally barred by any failure of plaintiffs to exhaust their remedies (see *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 291-295 [109 P.2d 942, 132 A.L.R. 715]), or for any other reason. If so, the summary judgment for defendants against all plaintiffs was proper notwithstanding the merits of the subvention claim. In that event, the judgment of the Court of Appeal must be reversed without consideration of the substantive issues raised by the appeal.

However, we find no failure to exhaust which would bar us from reaching the merits. Defendants concede plaintiffs exhausted all administrative remedies provided by the statutes governing subvention of state-mandated costs. The concession appears correct, at least as to the City and the County. These two agencies filed timely claims for reimbursement of expenses incurred to comply with chapter 2/78. When the Board initially denied the claims, the City and the County pursued judicial remedies culminating in

---

[4] Amicus curiae briefs were filed on behalf of plaintiffs by (1) the League of California Cities, the Association of California Water Agencies, and the Fire District Association of California, and (2) the County of Los Angeles and the County Supervisors Association of California.

*Sacramento I.* By direction of the judgment in *Sacramento I,* the Board ultimately upheld the City's and County's 1979 claims, determined their amount, and adopted "parameters and guidelines" for statewide reimbursement that were later included in the Board's government-claims report to the Legislature. (Rev. & Tax. Code, former §§ 2253.2, 2255, subd. (a).)

These procedures exhausted the City's and the County's administrative and judicial avenues, short of this suit, to obtain redress on the claims adjudicated in *Sacramento I.* Insofar as the Legislature thereafter declined to appropriate the necessary funds for disbursement by the Controller, the City and the County were authorized to bring an enforcement action. (Rev. & Tax. Code, former § 2255, subd. (c); Gov. Code, § 17612, subd. (b); *County of Contra Costa* v. *State of California* (1986) 177 Cal.App.3d 62, 72 [222 Cal.Rptr. 750]; see *Carmel Valley Fire Protection Dist.* v. *State of California* (1987) 190 Cal.App.3d 521, 548-549 [234 Cal.Rptr. 795].)[5]

■ Defendants urge, however, that plaintiffs essentially are seeking resolution of a "tax" question—the validity *vel non* of their unemployment tax contributions—but have failed to satisfy the special procedures applicable to such cases. Defendants insist that because article XIII, section 32, of the California Constitution broadly precludes any suit to enjoin or impede collection of a tax (e.g., *Calfarm Ins. Co.* v. *Deukmejian* (1989) 48 Cal.3d 805, 838-841 [258 Cal.Rptr. 161, 771 P.2d 1247]; *Western Oil & Gas Assn.* v. *State Bd. of Equalization* (1987) 44 Cal.3d 208, 213 [242 Cal.Rptr. 334, 745 P.2d 1360]; *Pacific Gas & Electric Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 277, 279-284 [165 Cal.Rptr. 122, 611 P.2d 463]), plaintiffs' claims for declaratory and injunctive relief are barred.

The only remedy constitutionally open to plaintiffs, defendants assert, is to pay their unemployment "taxes" and then seek a "refund" under the "exclusive" procedures set forth in the Unemployment Insurance Code. (Unemp. Ins. Code, §§ 1176 et seq., 1241, subd. (a).) Insofar as plaintiffs' complaint *does* seek reimbursement for past contributions, defendants suggest, plaintiffs have not correctly pursued the Unemployment Insurance Code procedures.

We question, but do not decide, whether a *public entity's* contributions to the state unemployment insurance system can ever constitute a "tax" sub-

---

[5] In 1986, the Legislature repealed sections 2250-2255 of the Revenue and Taxation Code. (Stats. 1986, ch. 879, §§ 37-48, p. 3047.) The Board's functions have been transferred to the Commission on State Mandates (Commission), but the procedures for administrative and judicial determination of subvention disputes remain functionally similar. (Gov. Code, §§ 17500 et seq., 17600 et seq.)

ject to article XIII, section 32. Even if so, defendants' claim lacks merit under the circumstances presented here.

"The policy behind [article XIII,] section 32 is to allow revenue collection to continue during [tax] litigation so that essential public services dependent on the funds are not unnecessarily disrupted. [Citation.] . . . ." (*Pacific Gas & Electric Co., supra,* 27 Cal.3d at p. 283.) The administrative "refund" procedures established by the unemployment insurance law are designed to ensure initial examination of unemployment tax disputes by the agency with specific expertise in that area.

However, plaintiffs attempt no challenge, direct or indirect, to the validity or application of the unemployment insurance law as such, or to the propriety of any "tax" assessed thereunder. Nor have plaintiffs bypassed the agency or procedures established to decide such disputes.

Rather, plaintiffs claim that *all* their costs of affording unemployment compensation to their employees are subject to a statutory and constitutional *subvention* which the state refuses to make. It is incidental that these costs happen to include what might be characterized as a "tax." As the subvention statutes require, plaintiffs City and County have pursued all available remedies before the agency (formerly the Board, now the Commission) created to decide *subvention* issues; that agency has upheld their submitted claims in full, but the necessary appropriations have been withheld.

Under these circumstances, the Legislature has concluded that a local entity should be forced to continue incurring the unfunded costs subject to "refund." Rather, the entity is expressly authorized to bring suit to declare such an unfunded mandate *unenforceable.* (Rev. & Tax. Code, former § 2255, subd. (c); Gov. Code, § 17612, subd. (b).)[6]

The importance of such a remedy stems from the fundamental legislative prerogative to control appropriations. ■ Under the separation of powers doctrine, the Legislature cannot be compelled to appropriate or authorize the disbursement of specific funds. (*Mandel* v. *Myers* (1981) 29 Cal.3d 531, 540 [174 Cal.Rptr. 841, 629 P.2d 935].) Since the Legislature will have demonstrated its refusal to fund a particular mandate by the time a mandamus action is filed, the literal "tax refund" process urged by defendants may often be meaningless.

■ Insofar as plaintiffs also seek reimbursement for past expenses, similar considerations dictate that the governing statutes are those created

---

[6] Indeed, when the City filed protective claims for "refund" with EDD in the wake of *Sacramento I,* that agency consistently disclaimed authority to decide the subvention issue presented and "suggest[ed]" that the City pursue its remedies before the Commission.

to resolve subvention problems rather than garden-variety disputes over the unemployment insurance tax.[7] We find nothing in the language, history, or purpose of article XIII, section 32, or of the unemployment insurance law, which bars the instant complaint. We therefore have jurisdiction to decide whether chapter 2/78 constitutes a reimbursable mandate.

### III. COLLATERAL ESTOPPEL; RES JUDICATA.

However, *plaintiffs* claim that because *Sacramento I* "finally" decided whether chapter 2/78 constitutes a reimbursable state mandate, the *state* and its agents are collaterally estopped from relitigating the issue here. The Court of Appeal agreed that the doctrine of collateral estoppel applies. Under the circumstances, we are not persuaded.

Generally, collateral estoppel bars the party to a prior action, or one in privity with him, from relitigating issues finally decided against him in the earlier action. (*Clemmer* v. *Hartford Insurance Co.* (1978) 22 Cal.3d 865, 874 [151 Cal.Rptr. 285, 587 P.2d 1098].) ". . . But when the issue is a question of law rather than of fact, the prior determination is not conclusive either if injustice would result or if the public interest requires that relitigation not be foreclosed. [Citations.] . . . ." (*Consumers Lobby Against Monopolies* v. *Public Utilities Com.* (1979) 25 Cal.3d 891, 902 [160 Cal.Rptr. 124, 603 P.2d 41].)

Even if the formal prerequisites for collateral estoppel are present here, the public-interest exception governs. Whether chapter 2/78 costs are reimbursable under article XIII B and parallel statutes constitutes a pure question of law. The *state* was the losing party in *Sacramento I,* and also the only entity legally affected by that decision. Thus, strict application of collateral estoppel would foreclose any reexamination of the holding of that case. The state would remain bound, and no other person would have occasion to challenge the precedent.

Yet the consequences of any error transcend those which would apply to mere private parties. If the result of *Sacramento I* is wrong but unimpeachable, taxpayers statewide will suffer unjustly the consequences of the state's continuing obligation to fund the chapter 2/78 costs of local agencies. On the other hand, if the state fails to appropriate the funds to meet this

---

[7] As we note above, courts are powerless to compel appropriations *per se.* However, that fact does not render a prayer for reimbursement of *past* costs wholly meaningless. California courts have previously recognized judicial power to fashion other appropriate reimbursement remedies. (See, e.g., *Carmel Valley Fire Protection Dist., supra,* 190 Cal.App.3d at pp. 550-552; also cf. *Mandel, supra,* 29 Cal.3d at pp. 535-537, 539-552.) Such power is especially important where subvention is constitutionally compelled.

obligation, and chapter 2/78 therefore cannot be enforced (Rev. & Tax. Code, former § 2255, subd. (c); Gov. Code, § 17612, subd. (b)), the resulting failure to comply with federal law could cost California employers millions.[8] ■ ■■ ■■ ■ (5c) Under these circumstances, neither stare decisis nor collateral estoppel can permanently foreclose our ability to examine the reimbursability of chapter 2/78 costs.[9]

■ As below, plaintiffs also argue that reconsideration of *Sacramento I* is precluded by res judicata. They suggest that the prior litigation resolved not only the *legal issues* presented by this appeal, but all *claims* among the current parties as well.

Of course, res judicata and the rule of final judgments bar us from disturbing individual claims or causes of action, on behalf of specific agencies, which have been finally adjudicated and are no longer subject to review. (Code Civ. Proc., § 1908 et seq.; *Slater, supra,* 15 Cal.3d at p. 796; *Bernhard v. Bank of America* (1942) 19 Cal.2d 807, 810 [122 P.2d 892].) However, the issues presented in the current action are not limited to the validity of any such finally adjudicated individual claims. Rather, they encompass the question of defendants' subvention obligations *in general* under chapter 2/78. We therefore conclude that defendants may contend in this lawsuit that chapter 2/78 is not a reimbursable state mandate.[10] We turn to the merits of that issue.

---

[8] For these reasons, this case is distinguishable from *Slater* v. *Blackwood* (1975) 15 Cal.3d 791 [126 Cal.Rptr. 225, 543 P.2d 593], cited by the Court of Appeal. *Slater,* a suit between private parties, held only that the "injustice" exception to the rule of collateral estoppel cannot be based *solely* on an intervening change in the law. (P. 796.) Here, as we note, overriding public-interest issues are involved.

[9] By the same token, the state has not ignored available remedies or otherwise "waived" its right to argue the issues presented by this appeal. The state immediately raised the applicability of *County of Los Angeles* to this suit once our decision therein became final.

Plaintiffs claim the instant trial court had no power to grant summary judgment for defendants on authority of *County of Los Angeles.* Plaintiffs assert that because defendants failed to seek timely mandamus review of the prior, contrary order granting summary adjudication of issues in *plaintiffs'* favor, the issues decided by the earlier order must be "deemed established." (See Code Civ. Proc., § 437c, subd. (f).) We disagree. Failure to challenge a summary adjudication order by the *discretionary* avenue of writ review cannot foreclose a party from asserting *subsequent* changes in law which render such a pretrial order incorrect.

[10] Plaintiffs imply that because the original claims by the City and the County were filed decided as statutory "test claims" (Rev. & Tax. Code, former §§ 2218, 2253.2; see now Gov. Code, §§ 17555, 17557), the "cause of action" adjudicated therein encompasses *all* claims by *all* local agencies for *all* years. However, the obvious purpose of the statutory "test claim" procedure is to resolve the *legal issue whether particular state legislation creates a reimbursable mandate,* not to adjudicate every individual claim for reimbursement which may thereafter accrue. The "test claim" result has *precedential* effect for all subsequent claims, but res judicata effect only for the individual claims which were actually adjudicated.

## IV. "NEW PROGRAM" OR "INCREASED SERVICE"?

As before, defendants urge that by extending unemployment insurance coverage to local government employees, the Legislature did not mandate a "new program" or an "increased" or "higher level of service" on local governments. Thus, they assert, the local costs of providing such coverage are not subject to subvention under article XIII B, section 6, or parallel statutes. (Rev. & Tax. Code, former §§ 2207, 2231, subd. (a); Gov. Code, §§ 17514, 17561, subd. (a).) The trial court granted summary judgment for defendants on this basis. Contrary to the conclusions reached by the Court of Appeal, the trial court's ruling was correct.

Our analysis is controlled by our decision in *County of Los Angeles.* There we determined that a general increase in workers' compensation benefits did not, when applied to local governments, constitute a reimbursable state mandate under article XIII B.

In so holding, we focused on the particular language of article XIII B, section 6, which requires state subvention of a local government's costs of any "new program" or "increased level of service" imposed upon it by the state. We dismissed the notion that, by employing the quoted phrases, the voters intended *all* local costs resulting from compliance with state law to be subject to mandatory reimbursement. Rather, we explained, "[t]he concern which prompted the inclusion of section 6 in article XIII B was the perceived attempt by the state to enact legislation or adopt administrative orders creating programs to be administered by local agencies, thereby transferring to those agencies the fiscal responsibility for providing services which the state believed should be extended to the public. . . ." (43 Cal.3d at p. 56.)

Under these circumstances, we reasoned, the electorate must have intended the undefined terms "new program" and "increased level of service" to carry their "commonly understood meanings . . .—programs that carry out the governmental function of providing *services to the public,* or laws which, to implement a state policy, impose *unique requirements* on local governments and do not apply generally to all residents and entities in the state." (43 Cal.3d at p. 56, italics added.)

Local governments' costs of complying with a general statewide increase in the level of workers' compensation benefits do not qualify under these standards, we concluded. As we noted, ". . . [w]orkers' compensation is not a program administered by local agencies to provide service to the public. Although local agencies must provide benefits to

their employees . . ., they are indistinguishable in this respect from private employers. . . ." (43 Cal.3d at p. 58.)[11]

 Similar considerations apply here. By requiring local governments to provide unemployment compensation protection to their own employees, the state has not compelled provision of new or increased "service to the public" at the local level. Nor has it imposed a state policy "unique[ly]" on local governments. Most private employers in the state already were required to provide unemployment protection to their employees. Extension of this requirement to local governments, together with the state government and nonprofit corporations, merely makes the local agencies "indistinguishable in this respect from private employers."

Plaintiffs nonetheless suggest there are several bases for reaching a different result here than in *County of Los Angeles.* None of the asserted distinctions has merit.

Plaintiffs first note the proponents' declaration in the voters' pamphlet that the purpose of article XIII B, section 6, was to prevent the state from "forcing" unfunded programs on local agencies. Plaintiffs invoke this pamphlet language for the proposition that any new cost "forced" on local governments by state law is subject to subvention.

The claim is directly contrary to our holding in *County of Los Angeles.* As we explained, "[i]n . . . context, the [pamphlet] phrase 'to force *programs* on local governments' confirms that the intent underlying section 6 [of article XIII B] was to require reimbursement to local agencies for the costs involved in carrying out *functions peculiar to government,* not for expenses incurred by local agencies as an *incidental impact* of laws that apply generally to all state residents and entities. . . . [¶] The language of section 6 is far too vague to support an inference that . . . each time the Legislature

---

[11] While our discussion centered on the meaning of section 6 of article XIII B, it relied heavily on the legislative history of parallel provisions of the 1972 and 1973 property tax relief statutes. When article XIII B was adopted in November 1979, the Revenue and Taxation Code already required state subvention of local "[c]osts mandated by the state," defined as "any increased costs which a local agency is required to incur as a result of . . . [¶] [a]ny law enacted after January 1, 1973, which mandates a *new program* or an *increased level of service* of an existing program." (Rev. & Tax. Code, former §§ 2207 [italics added], 2231, subd. (a).) However, a further statutory definition of "increased level of service" to include any state mandate "which makes necessary expanded or additional costs to a county, city and county, city, or special district" had been repealed in 1975. (*County of Los Angeles,* 43 Cal.3d at p. 55; see Rev. & Tax. Code, former § 2231, subd. (e), repealed by Stats. 1975, ch. 486, § 6, p. 999.) We found the repealer significant to the limited meaning of the statutory term "increased level of service" as later incorporated in article XIII B. (43 Cal.3d at pp. 55-56.) Our implicit conclusion, which we now make explicit, was that the statutory and constitutional concepts of reimbursable state-mandated costs are identical.

passes a law of general application it must discern the likely effect on local governments and provide an appropriation to pay for any incidental increase in local costs. . . ." (43 Cal.3d at pp. 56-57, italics added.)[12]

Plaintiffs next urge the Court of Appeal's premise—that chapter 2/78 did impose a "unique" requirement on local agencies within the meaning of *County of Los Angeles,* since it applied only to them, and compelled costs to which they were not previously subject. Plaintiffs cite our recent decision in *Lucia Mar Unified School Dist.* v. *Honig* (1988) 44 Cal.3d 830 [244 Cal.Rptr. 677, 750 P.2d 318]. There we held, inter alia, that by requiring each local school district to contribute part of the expense of educating its handicapped students in state-run schools—a cost previously absorbed entirely by the state—the Legislature created a *"new* program" subject to subvention under article XIII B, section 6. As we observed, "although the schools for the handicapped have been operated by the state for many years, the program was *new insofar as [the local districts] are concerned* . . . ." (P. 835, italics added.)

*Lucia Mar* is inapposite here. The education of handicapped students was clearly a traditional governmental "service to the public," and it qualified as a "program" on that basis. This function had long been performed by the state, and the only issue was whether the belated shifting of the program's costs to local governments made it "new" for subvention purposes. A negative answer to that question would have undermined a central purpose of article XIII B, section 6—to prevent the state's transfer of the *cost of government* from *itself* to the local level.

Here, the issue is whether costs *unrelated* to the provision of public services are *nonetheless* reimbursable costs of government, because they are imposed on local governments "unique[ly]," and not merely as an incident of compliance with general laws. State and local governments, and nonprofit corporations, had previously enjoyed a special *exemption* from requirements imposed on most other employers in the state and nation. Chapter 2/78 merely eliminated the exemption and made these previously exempted entities subject to the general rule. By doing so, it may have imposed a requirement "new" to local agencies, but that requirement was not "unique."

---

[12] Indeed, our reasoning here was expressly foreshadowed in *County of Los Angeles.* There we observed: "The Court of Appeal reached a different conclusion in [*Sacramento I*], with respect to a newly enacted law requiring that all public employees be covered by unemployment insurance. Approaching the question as . . . whether the expense was a 'state mandated cost,' rather than as whether the provision of an employee benefit was a 'program or service' within the meaning of the Constitution, the court concluded that reimbursement was required. To the extent that this decision is inconsistent with our conclusion here, it is disapproved." (43 Cal.3d at p. 58, fn. 10.)

The distinction proposed by plaintiffs would have an anomalous result. The state could avoid subvention under *County of Los Angeles* standards by imposing new obligations on the public and private sectors *at the same time.* However, if it chose to proceed by stages, extending such obligations first to private entities, and only later to local governments, it would have to pay. This was not the intent of our recent decision.

Next, plaintiffs complain that the new costs imposed on local governments by chapter 2/78 are too great to be deemed "incidental" within the meaning of *County of Los Angeles.* However, our decision did not use the word "incidental" to mean merely "insignificant in amount." Rather, we declared that the state need not reimburse local governments for expenses *incidentally imposed* upon them by laws of general application. In *County of Los Angeles,* we assumed that the expenses imposed *in common* on the private and public sectors by such a general law—as by the across-the-board increase in workers' compensation benefits there at issue—might be substantial. Notwithstanding this possibility, we found the voters did not intend to require a state subsidy of the public sector in such cases. (43 Cal.3d at pp. 56-58.)

Finally, plaintiffs and their amici curiae urge us to overrule *County of Los Angeles.* They insist that our "program" and "unique requirement" limitations conflict with the language and purpose of article XIII B. First, they note that *nonreimbursable* state-mandated costs are expressly listed in subdivisions (a) through (c) of article XIII B, section 6.[13] Under the maxim *inclusio unius est exclusio alterius,* they reason, further exceptions may not be implied. Second, they assert, our limiting construction allows the state to "force" many costly but unfunded requirements on local governments, which the latter must absorb without relief from their own article XIII B spending limits. This, they aver, cannot have been the voters' intent.

These arguments misapprehend both the language of article XIII B, section 6, and our *County of Los Angeles* holding. Our reasoning in that case is not inconsistent with subdivisions (a) through (c) of section 6. Those paragraphs simply exclude certain state-imposed costs *even if they would otherwise be reimbursable under the "new program" or "increased service"*

---

[13] Article XIII B, section 6, provides that the state shall provide a subvention of funds to reimburse a local agency for costs incurred by the agency "[w]henever the [state] mandates [on the agency] a new program or higher level of service . . . , except that the Legislature may, but need not, provide such subvention of funds for the following mandates: [¶] (a) Legislative mandates requested by the local agency affected; [¶] (b) Legislation defining a new crime or changing an existing definition of a crime; or [¶] (c) Legislative mandates enacted prior to January 1, 1975, or executive orders or regulations initially implementing legislation enacted prior to January 1, 1975."

*standards.* Subdivisions (a) through (c) do not purport to define what constitutes a "new program" or "increased level of service."

Moreover, the "program" and "service" standards developed in *County of Los Angeles* create no undue risk that the state will impose expensive unfunded obligations against local agencies' article XIII B spending limits. On the contrary, our standards require reimbursement whenever the state freely chooses to impose on local agencies *any* peculiarly "governmental" cost which they were not previously required to absorb.

On the other hand, as we explained in *County of Los Angeles,* extension of the subvention requirements to costs "incidentally" imposed on local governments would require the Legislature to assess the fiscal effect on local agencies of each law of general application. Moreover, it would subject much general legislation to the supermajority vote required to pass a companion local-government revenue bill. Each such necessary appropriation would, in turn, cut into the *state's* article XIII B spending limit. (§ 8, subd. (a).) We concluded that nothing in the language, history, or apparent purpose of article XIII B suggested such far-reaching limitations on legitimate state power. (43 Cal.3d at pp. 56-58.)

We remain persuaded by this reasoning.[14] We decline to overrule *County of Los Angeles.* Under the teaching of that case, we hold that chapter 2/78 imposes no local costs which must be reimbursed pursuant to article XIII B, section 6, and parallel statutes.

## V. "FEDERAL" MANDATE?

■■■ This case proceeded through the Court of Appeal solely on the issue whether chapter 2/78 constitutes a reimbursable "state mandate," as defined in *County of Los Angeles.* After we granted review, and in the public interest, we also decided to reexamine a related holding contained in *Sacramento I*—that chapter 2/78 does not qualify as a "federal" mandate.

Proper application of the "federal mandate" concept has important implications beyond subvention. A "cost mandated by the federal government" is exempt from a local government's statutory taxation limit. (Rev. & Tax. Code, § 2271.) Moreover, an appropriation required to comply with a

---

[14] Nor do we agree that subvention depends on whether the "benefit" of a state-imposed local requirement falls principally at the state or local level. Attempts to apply such a "benefit" test to the myriad of individual cases could easily produce debates bordering on the metaphysical. Nothing in the language or history of article XIII B, or prior subvention statutes, suggests an intent to force such debates upon the Legislature each time it considers legislation affecting local governments.

federal mandate is excluded from the constitutional spending limit of any affected entity, state or local (Cal. Const., art. XIII B, § 9 (b)). Accordingly, we requested supplemental briefs on this question.[15]

After due consideration, we reject *Sacramento I*'s premise. We conclude that chapter 2/78 does impose "costs mandated by the federal government," as described in article XIII B and parallel statutes.[16]

Article XIII B, section 9(b), defines federally mandated appropriations as those "required for purposes of complying with mandates of . . . the federal government which, *without discretion,* require an expenditure for additional services or which *unavoidably make the providing of existing services more costly.*" (Italics added.)

As in *Sacramento I,* plaintiffs argue that the words "without discretion" and "unavoidably" require clear *legal* compulsion not present in Public Law 94-566. Defendants respond, as before, that the consequences of California's failure to comply with the federal "carrot and stick" scheme were so substantial that the state had no realistic "discretion" to refuse.[17] In *Sacramento I,* the Court of Appeal adopted plaintiffs' narrow view. On reflection, we disagree.

Though section 9(b) seems plain on its face, we find a latent ambiguity in context. At the time article XIII B was adopted, United States Supreme Court decisions construing the Tenth Amendment *severely limited* federal power to dictate policy or programs to the sovereign states or their subdivisions.[18] Indeed, by its early ruling that federal unemployment insurance

---

[15] For the reasons expressed in part III, *ante,* our consideration of this issue is not foreclosed by principles of collateral estoppel.

[16] In *Sacramento I,* both the parties and the Court of Appeal assumed that if a cost was "federally mandated," it was therefore *not* a "state mandated" cost subject to subvention. In other words, it was assumed, an expense could not be both "state mandated" and "federally mandated," even if imposed by the state under federal compulsion. It was in this context that *Sacramento I* addressed the "federal mandate" issue. (See also *Carmel Valley Fire Protection Dist., supra,* 190 Cal.App.3d at p. 543.) We here express no view on the question whether "federal" and "state" mandates are mutually exclusive for purposes of state subvention, but leave that issue for another day. We decide only that, insofar as an expense is "federally mandated," as described in the state Constitution and statutes, it is exempt from the pertinent taxation and spending limits.

[17] Ironically, the local agencies here argue *against* a "federal mandate," with the state in opposition to that view. An anti-"federal mandate" position seems directly contrary to the local agencies' interests, since its acceptance would mean the agencies are not eligible for exemptions from their pertinent taxing and spending limits. However, all parties appear still bound by the premise of *Sacramento I* that if a cost is "federally mandated," it is ineligible for state subvention. As noted above (see fn. 16, *ante*), we do not decide that issue here.

[18] The Tenth Amendment to the United States Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

laws did not violate state sovereignty insofar as they merely employed a "carrot and stick" to induce state compliance (*Steward Machine Co.* v. *Davis, supra,* 301 U.S. 548, 585-593 [81 L.Ed. 1279, 1290-1294]), the high court helped set the stage for two generations of pervasive federal regulation by this indirect means.[19]

Just three years before article XIII B was adopted, the court struck down, on Tenth Amendment grounds, Congress's effort to extend the minimum-wage and maximum-hour requirements of the Fair Labor Standards Act directly to local government employees. (*National League of Cities* v. *Usery* (1976) 426 U.S. 833 [49 L.Ed.2d 245, 96 S.Ct. 2465].) Overruling earlier authority (see *Maryland* v. *Wirtz* (1968) 392 U.S. 183 [20 L.Ed.2d 1020, 88 S.Ct. 2017]), the court held in *Usery, supra,* that constitutional principles of federalism prohibit Congress from using its otherwise "plenary" commerce power against the "States as States," so as to interfere with the essential "attributes of [state government] sovereignty." (426 U.S. at pp. 840-855 [49 L.Ed.2d at pp. 250-260].) Accordingly, said the court, Congress could not "force directly upon the States its choices as to how essential decisions regarding the conduct of integral governmental functions are to be made. . . ." (*Id.*, at p. 855 [49 L.Ed.2d at p. 259].)

*Usery* dealt with federal efforts to regulate sovereign units of government as employers. However, the court's rationale obviously applied with equal or greater force to direct federal regulation of state and local governments *as governments.* Under *Usery*'s reasoning, it seems manifest that Congress's direct power to require or prohibit substantive governmental policies or programs by state or local agencies was greatly curtailed. Such power would interfere impermissibly with "integral governmental functions" and essential "attributes of [state] sovereignty.[20]

---

[19]The traditional categorical-aid provisions of the Social Security Act (e.g., 42 U.S.C. §§ 301 et seq. [old-age assistance], 601 et seq. [aid to needy families with dependent children], 1201 et seq. [aid to the blind], 1351 et seq. [aid to the permanently and totally disabled]), and statutes concerned with occupational safety and health (e.g., 29 U.S.C. § 651 et seq.), highways and mass transit (e.g., 23 U.S.C. § 101 et seq.), education (e.g., 20 U.S.C. § 241a et seq.), and air and water pollution (e.g., 33 U.S.C. §§ 1251 et seq., 1311 et seq.; 42 U.S.C. § 7401 et seq.) are but a few examples of federal laws imposing greater or lesser degrees of inducement to state and local compliance with federal policies and programs.

[20]*Hodel* v. *Virginia Surface Mining & Recl. Assn.* (1981) 452 U.S. 264 [69 L.Ed.2d 1, 101 S.Ct. 2352] later implicitly confirmed this premise. There, Virginia mine operators challenged a federal surface-mining regulatory scheme on grounds it displaced state authority and sovereignty. The federal law imposed minimum federal standards, to be enforced by federal or state officials at the state's choice, and allowed states to take over regulation by imposing equal or higher standards of their own. (30 U.S.C. §§ 1201 et seq., 1251-1254.) The court upheld the program, noting it regulated private persons, not the "States as States." Moreover, said the court, since states were not ordered to adopt their own surface-mining standards, "there can be no suggestion that the Act commandeers the legislative processes of the

*After* article XIII B's adoption, both the result and the reasoning of *Usery* were overruled in *Garcia* v. *San Antonio Metro. Transit Auth.* (1985) 469 U.S. 528 [83 L.Ed.2d 1016, 105 S.Ct. 1005]. In *Garcia,* a five-justice majority concluded that the political structure of the federal system, rather than rigid categories of inviolable state "sovereignty," constitutes state and local governments' primary protection against Congress's overreaching efforts to regulate them. (Pp. 547-555 [83 L.Ed.2d at pp. 1031-1037].)

However, this later development does not alter two crucial facts extant when article XIII B was enacted. First, the power of the federal government to impose its direct regulatory will on state and local agencies was *then* sharply in doubt. Second, in conformity with this principle, the vast bulk of cost-producing federal influence on government at the state and local levels was by inducement or incentive rather than direct compulsion.[21] That remains so to this day.

Thus, if article XIII B's reference to "federal mandates" were limited to strict legal compulsion by the federal government, it would have been largely superfluous.[22] ■ It is well settled that "constitutional . . . enactments must receive a liberal, practical common-sense construction which will meet changed conditions and the growing needs of the people. [Citations.] . . . ." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) While "[a] constitutional amendment should be construed in accordance with the natural and ordinary meaning of its words[,] [citation] [, t]he literal language of enactments may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers. [Citations.]" (*Ibid.*)

■ As the drafters and adopters of article XIII B must have understood, certain regulatory standards imposed by the federal government

---

States by directly compelling them to enact and enforce a federal regulatory program. [Citations.] . . . ." (452 U.S. at pp. 286-288 [69 L.Ed.2d at pp. 22-24].)

[21] The United States Constitution includes specific limitations on the subject-matter jurisdiction of state and local governments (art. I, § 10), imposes certain direct obligations and restrictions on the "States as States" (e.g., art. I, § 2, cls. 1, 4; art. I, § 3, cls. 1, 2; art II, § 1, cl. 2; art. IV, §§ 1, 2, cls. 1, 2; Amends. XIV, XV), and grants Congress power to prevent denial of certain constitutional rights by the states (Amends. XIII, XIV, XV). Obviously, however, these provisions account for only a minute portion of the costs incurred by state and local governments as a result of federal programs and regulations.

[22] For this reason, federal cases cited by plaintiffs and their amici curiae for the proposition that Public Law 94-566 is not "coercive" (e.g., *County of Los Angeles, Cal.* v. *Marshall* (D.C. Cir. 1980) 631 F.2d 767 [203 App.D.C. 185]; *State, etc.* v. *Marshall* (1st. Cir. 1980) 616 F.2d 240) are inapposite. Those decisions applied *Tenth Amendment* principles to determine whether Public Law 94-566 was constitutionally valid. Had Public Law 94-566 been struck down on this ground, it would *not* have resulted in local costs to which the "federal mandate" provisions of article XIII B might extend. Thus, applying the Tenth Amendment cases to determine whether a cost is "federally mandated" for purposes of article XIII B presents a problem in circular reasoning.

under "cooperative federalism" schemes are coercive on the states and localities in every practical sense. The instant facts amply illustrate the point. Joint federal-state operation of a system of unemployment compensation has been a fundamental aspect of our political fabric since the Great Depression. California had afforded federally "certified" unemployment insurance protection to its workers for over 40 years by the time Public Law 94-566, chapter 2/78, and article XIII B were adopted. Every other state also operated such a system. If California failed to conform its plan to new federal requirements as they arose, its businesses faced a new and serious penalty—full, double unemployment taxation by both state and federal governments. Besides constituting an intolerable expense against the state's economy on its face, this double taxation would place California employers at a serious competitive disadvantage against their counterparts in states which remained in federal compliance.

Plaintiffs and their amici curiae suggest California could have chosen to terminate its own unemployment insurance system, thus leaving the state's employers faced only with the federal tax. However, we cannot imagine the drafters and adopters of article XIII B intended to force the state to such draconian ends.

Here, the state simply did what was necessary to avoid certain and severe federal penalties upon its resident businesses. The alternatives were so far beyond the realm of practical reality that they left the state "without discretion" to depart from federal standards. We therefore conclude that the state acted in response to a federal "mandate" for purposes of article XIII B.[23]

[23] The dissent cites two older cases for the premise that in antidebt and antispending measures, the exception recognized for "mandatory" costs and expenditures has traditionally been limited to obligations imposed by law. Neither cited decision is dispositive or persuasive here.

County of Los Angeles v. Byram (1951) 36 Cal.2d 694 [227 P.2d 4], and the cases therein cited, concern the constitutional provision (Cal. Const., former art. XI, § 18, see now art. XVI, § 18 (hereafter section 18)) which prohibits local governments, absent voter approval, from incurring debts or liabilities which exceed in any year the income or revenue provided for such year. Section 18 is absolute on its face and, unlike article XIII B, it contains no express exception for mandatory expenses. Though sometimes founded on contorted linguistic analyses (see, e.g., City of Long Beach v. Lisenby (1919) 180 Cal. 52, 56 [179 P. 198]), the implied exceptions to section 18, as recognized in Byram and other cases, arise from a rule of necessity and despite the absolute constitutional language. Such implied exceptions must, of course, be narrowly confined.

On the other hand, County of Los Angeles v. Payne (1937) 8 Cal.2d 563 [66 P.2d 658], also cited by the dissent, construed former Political Code section 3714, which limited a local government's annual expenditures to its previously adopted budget. Section 3714 did contain an express exception for "mandatory expenses required by law." (Italics added.) Payne's adherence to the explicit terms of the statutory exception is hardly remarkable.

In contrast with the measure considered in Byram, article XIII B and the Revenue and Taxation Code do expressly exempt "federally mandated" expenses from the pertinent

Unlike the *Sacramento I* court, we deem significant the Legislature's persistent agreement with our construction. In 1980, after the adoption of article XIII B, it amended the statutory definition of "costs mandated by the federal government" to provide that these include "costs resulting from enactment of a state law or regulation where failure to enact such law or regulation *to* meet specific federal program or service requirements would result in *substantial monetary penalties* or *loss of funds* to *public or private persons* in the state. . . ." (Rev. & Tax. Code, § 2206, italics added; Stats. 1980, ch. 1256, § 3, p. 4247.)

In *Sacramento I,* the Court of Appeal declined to apply this statutory amendment "retroactively" to article XIII B. (156 Cal.App.3d at pp. 197-198.) The Legislature immediately responded. In 1984 statutes enacted for the express purpose of "implement[ing]" article XIII B (see Gov. Code, § 17500), the Legislature reiterated its 1980 definition. (*Id.,* § 17513; Stats. 1984, ch. 1459, § 1, p. 5114.)[24]

Plaintiffs contend that these statutory pronouncements deserve little interpretive weight since, among other things, they are "internally inconsistent." Plaintiffs stress the proviso in Revenue and Taxation Code, section 2206, and in Government Code, section 17513, that the phrase " '[c]osts mandated by the federal government' does *not* include costs which are specifically reimbursed or funded by the federal or state government or programs or services which may be implemented at the *option* of the state, local agency, or school district." (Italics added.)

We see no fatal inconsistencies. The first clause of the proviso merely confirms, as article XIII B itself specifies, that program funds voluntarily provided by another unit of government may not be excluded from the

---

taxation and appropriations limits. Unlike the measure construed in *Payne,* neither article XIII B nor the Revenue and Taxation Code expressly limit their exemptions to obligations "required by law." Article XIII B uses the broader terms "unavoidably" and "without discretion," suggesting recognition by the drafters and voters that forces beyond strict legal compulsion may produce expenses that are realistically involuntary. The Revenue and Taxation Code explicitly includes coercive federal "carrot and stick" requirements within the federally "mandated" costs exempt from statutory property tax limits. (Rev. & Tax. Code, § 2206.)

[24] Plaintiffs suggest that by reenacting this language in the wake of *Sacramento I,* the Legislature "acquiesced" in the Court of Appeal's narrow definition of "costs mandated by the federal government." We are not persuaded. *Sacramento I* did not *construe* the statutory language; it simply found a postdated statute *irrelevant* to the proper interpretation of article XIII B. By later readopting its expanded definition in statutes designed to "implement" article XIII B, the Legislature expressed its disagreement with *Sacramento I,* not its acquiescence. Contrary to the implications of *Sacramento I,* legislative efforts to resolve ambiguities in constitutional language are entitled to serious judicial consideration. (See authorities cited *ante.*)

spending limits of recipient local agencies. (Compare art. XIII B, §§ 8, subd. (b), 9(b).) The second clause isolates a concern which we share—that state or local governments might otherwise claim "federally mandated costs" even where participation in a federal program, or compliance with federal "standards," is a matter of true choice. (Cf., e.g., *Carmel Valley Fire Protection Dist., supra,* 190 Cal.App.3d at pp. 542-544.)[25]

Given the variety of cooperative federal-state-local programs, we here attempt no final test for "mandatory" versus "optional" compliance with federal law. ■■■ A determination in each case must depend on such factors as the nature and purpose of the federal program; whether its design suggests an intent to coerce; when state and/or local participation began; the penalties, if any, assessed for withdrawal or refusal to participate or comply; and any other legal and practical consequences of nonparticipation, noncompliance, or withdrawal. Always, the courts and the Commission must respect the governing principle of article XIII B, section 9(b): neither state nor local agencies may escape their spending limits when their participation in federal programs is truly voluntary.

■■■ For reasons expressed above, we are satisfied under these standards that chapter 2/78 did implement a federal "mandate" within the meaning of article XIII B and prior statutes restricting local taxation. Hence, subject to superseding constitutional ceilings on taxation by state and local governments, an agency governed by chapter 2/78 may tax and spend as necessary to meet the expenses required to comply with that legislation. To the extent *Sacramento I* is inconsistent with our analysis, that decision is disapproved.

## VI. CONCLUSION.

We have concluded that chapter 2/78 is a "federal mandate" which exempts affected state and local agencies from pertinent limits on their power to tax, appropriate, and spend. However, local governments' ex-

---

[25] In the *Carmel Valley* case, the state claimed, among other things, that local costs of purchasing protective clothing and equipment for firefighters, as required by regulations under the California Occupational Safety and Health Act, constituted a nonreimbursable "federal mandate" because the California standards merely "implemented" federal law. However, the evidence was contrary; a letter from the federal Occupational Safety and Health Administration disclaimed federal jurisdiction over California's political subdivisions and stated that state and federal standards were independent. (190 Cal.App.3d at pp. 543-544.) Examination of the pertinent statutory scheme reinforces the view that compliance with federal standards in this area is "optional" with the state. Other than loss of limited federal administrative funds (29 U.S.C. § 672(g)), the only sanction for California's decision not to maintain a federally approved occupational safety and health system is that federal standards, administered by federal personnel, will then prevail within the state. (*Id.,* § 667(b)-(h).)

penses of complying with chapter 2/78 are not subject to compulsory state subvention, because chapter 2/78 imposed no new or increased "program or service," and no "unique" requirement, on local agencies. The contrary judgment of the Court of Appeal is reversed.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., and Kennard, J., concurred.

KAUFMAN, J., Concurring and Dissenting.—I concur in the judgment. Given this court's decision in *County of Los Angeles* v. *State of California* (1987) 43 Cal.3d 46 [233 Cal.Rptr. 38, 729 P.2d 202], I am compelled to agree that the obligation imposed on local governments by the 1978 state unemployment insurance legislation is not a "new program or higher level of service" within the meaning of article XIII B, section 6, of the California Constitution, and that for this reason the state is not constitutionally obligated to provide a subvention of funds to reimburse the unemployment insurance costs of local governments. I respectfully dissent, however, from the additional conclusion, stated in part V of the majority opinion, that these unemployment insurance costs are "mandates of . . . the federal government" and therefore exempt from the state and local government appropriation limits of article XIII B and from property taxation limits imposed by statute. In reaching this additional conclusion the majority decides an issue not raised by the parties and completely outside the scope of this action. As so often happens when a court reaches beyond the confines of the case before it to render a gratuitous advisory opinion, the majority decides the issue incorrectly.

All too frequently in recent years (see, e.g., *S. G. Borello & Sons, Inc.* v. *Department of Industrial Relations* (1989) 48 Cal.3d 341, 345, fn. 1 [256 Cal.Rptr. 543, 769 P.2d 399]) this court, in its misguided zeal to provide enlightenment, has reached out to decide an issue not tendered by the parties. The majority's failure to exercise proper judicial restraint in the instant case is another example of this trend and one I find particularly disturbing since it violates a fundamental and venerable tenet of judicial practice—i.e., "A court will not decide a constitutional question unless such construction is absolutely necessary." (*Estate of Johnson* (1903) 139 Cal. 532, 534 [73 P. 424]; accord, *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000]; *Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65 [195 P.2d 1].) The federal mandate issue which the majority here decides, because it turns on the proper construction of article XIII B, section 9, of our state Constitution, is a constitutional issue. Using this case to resolve that issue is, to my mind, indefensible.

To see just how far the majority has wandered from the issues essential to the proper resolution of this case, one need only point out that this action

was not brought to settle a dispute about taxation or appropriation limits, nor has this court been informed that any such dispute exists. Rather, this action was brought to enforce the holding in *City of Sacramento v. State of California* (1984) 156 Cal.App.3d 182 [203 Cal.Rptr. 258] (*Sacramento I*), that the state is constitutionally obligated to reimburse the unemployment insurance costs of local governments. The governmental entities litigating this proceeding have not sought a judicial determination of the 1978 unemployment insurance legislation's effect on their statutory or constitutional taxing or spending limits, nor have they raised any issue regarding whether unemployment insurance costs are federally mandated for any purpose. The federal mandate issue was first injected into the case by this court when we requested additional briefing on the questions whether the unemployment insurance costs of local governments are federally mandated under article XIII B, section 9, of the state Constitution and, if so, whether this conclusion necessarily exempts the state from any obligation it might otherwise have to reimburse local governments for these costs.

The majority's federal mandate discussion does not even provide an alternative ground for the holding denying reimbursement of local governments' unemployment insurance costs, for the majority purports to decide whether unemployment insurance costs are federally mandated without deciding whether resolution of this issue has any bearing on entitlement to reimbursement (see maj. opn., *ante*, p. 71, fn. 16). The majority's only justification for deciding whether unemployment insurance costs are federally mandated is that the issue has "important implications" inasmuch as federally mandated costs are "exempt from a local government's statutory taxation limit (Rev. & Tax. Code, § 2271)" and "from the constitutional spending limit of any affected entity, state or local (Cal. Const., art. XIII B, § 9(b))." (Maj. opn., *ante*, pp. 70-71.) But the present case is an inappropriate vehicle for deciding these weighty issues since neither the state nor the local entities have any reason to contest the other's exemptions from spending or taxation limits. In other words, the parties now before us are not adverse on these issues and so have not defined and argued opposing points of view with the vigor and thoroughness essential to proper judicial resolution of complex legal questions, particularly those of constitutional magnitude. Those who might have argued in favor of including unemployment insurance costs in the taxing and spending limits—for example, the proponents of the initiative measure by which article XIII B was enacted—are not represented in this proceeding.

Were the issue properly presented in this case, I would conclude that the unemployment insurance costs are not federally mandated. The text of a constitution "should be construed in accordance with the natural and ordinary meaning of its words." (*Amador Valley Joint Union High Sch. Dist.* v.

*State Bd. of Equalization* (1978) 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281].) The language at issue here excludes from the definition of "appropriations subject to limitation" those appropriations "required for purposes of complying with *mandates* of the courts or the federal government which, *without discretion, require* an expenditure for additional services or which *unavoidably* make the providing of existing services more costly." (Cal. Const., art. XIII B, § 9, subd. (b), italics added.)

The meaning of this language is clear; to look beyond the text for some other meaning is both unnecessary and improper under accepted rules of constitutional interpretation. (See *State Board of Education* v. *Levit* (1959) 52 Cal.2d 441, 462 [343 P.2d 8]; *People* v. *Knowles* (1950) 35 Cal.2d 175, 182-183 [217 P.2d 1].) A "mandate" is "an order, command [or] charge." (*Xth Olympiad Com.* v. *American Olym. Assn.* (1935) 2 Cal.2d 600, 604 [42 P.2d 1023]; see also, *Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606] ["mandatory duty" is "an obligatory duty which a governmental entity is required to perform"]; *Bridgman* v. *American Book Co.* (1958) 12 Misc.2d 63, 66 [173 N.Y.S.2d 502, 506] ["mandate" is "a command, order or direction . . . which a person is bound to obey"].) The mandates to which the constitutional provision at issue refers are those "of the courts or the federal government." The coercive force of court mandates is, of course, the force of law. That "mandates of . . . the federal government" are similarly limited to those obligations imposed by force of federal law is shown not only by the term "mandate" itself but also by the terms "without discretion" and "unavoidably," which plainly exclude any form of inducement using political or economic pressure rather than legal compulsion.

Laws limiting governmental appropriations and indebtedness have traditionally exempted two categories of expenditures: those required to meet emergencies and those required to satisfy duties or mandates imposed by law. (See, e.g., *County of Los Angeles* v. *Byram* (1951) 36 Cal.2d 694, 698-700 [227 P.2d 4]; *County of Los Angeles* v. *Payne* (1937) 8 Cal.2d 563, 569-575 [66 P.2d 658]; *State* v. *City Council of City of Helena* (1939) 108 Mont. 347 [90 P.2d 514, 516]; *Raynor* v. *King County* (1940) 2 Wn.2d 199 [97 P.2d 696, 707].) The latter category has been interpreted as including only those obligations compelled by force of law, as opposed to economic or political necessity or expedience. (See *County of Los Angeles* v. *Byram, supra,* at pp. 698-700; *County of Los Angeles* v. *Payne, supra,* at pp. 573-574.) Article XIII B of the California Constitution follows the pattern of other similar laws; it provides exemptions for emergency appropriations in section 3, subdivision (c), and for legal duties or "mandates" in section 9, subdivision (b). I see no basis for concluding that the term "mandate," which in the context of government debt and appropriation limitations has traditionally

meant a duty imposed by force of law, has suddenly acquired a novel and more expansive meaning in section 9. On the contrary, the drafters of section 9 appear to have taken pains to avoid any such interpretation.

As stated in *Sacramento I,* "The concept of federal mandates . . . is defined in section 9 of article XIII B. Subdivision (b) of that section excludes from a governmental entity's appropriation limit '[a]ppropriations required for purposes of complying with mandates of . . . the federal government which, *without discretion, require* an expenditure' by the governmental entity. (Italics added.) As contemplated by article XIII B, section 9, a federal mandate is one pursuant to which the federal government imposes a cost upon a governmental entity, and the entity has *no discretion* to refuse the cost. Chapter 2 [the 1978 unemployment insurance legislation] was not a federal mandate within this constitutional definition, as the State had the discretion to participate or not in the federal unemployment insurance system." (*Sacramento I, supra,* 156 Cal.App.3d 182, 197, italics in original.) Giving the constitutional language its usual and ordinary meaning, I agree with the Court of Appeal that federal law "mandates" an expenditure only if the expenditure is legally compelled, and not if the federal law merely provides economic or political inducements, no matter how powerful or coercive. Since it is undisputed that the state was under no legal compulsion to enact the 1978 unemployment insurance legislation, the burdens of that legislation are not "mandates of . . . the federal government."

In support of its contrary conclusion, the majority reasons as follows: (1) when article XIII B of the California Constitution was drafted and enacted, the Tenth Amendment to the United States Constitution had been construed to prohibit Congress from imposing costs on state and local governments; (2) as a result, virtually all federal laws imposing costs on state and local governments did so through "carrot and stick" incentive programs rather than by direct legal compulsion; and (3) the exemption for "mandates of . . . the federal government" must be construed to encompass at least some of these incentive programs because otherwise it would be almost entirely superfluous. I find each of these points highly questionable, if not demonstratively unsound.

First, the Tenth Amendment has never been interpreted as entirely prohibiting the federal government from imposing costs on state and local government. Rather, *National League of Cities* v. *Usery* (1976) 426 U.S. 833 [49 L.Ed.2d 245, 96 S.Ct. 2465] defined an exception to the broad sweep of Congress's commerce clause authority. Under this exception, "traditional governmental functions" of state and local governments were protected from direct and intrusive federal regulation. (426 U.S. at p. 852 [49 L.Ed.2d at pp. 257-258].) As explained in *Garcia* v. *San Antonio Metro. Transit*

*Auth.* (1985) 469 U.S. 528, 538-547 [83 L.Ed.2d 1016, 1025-1032, 105 S.Ct. 1005], the result was an inconsistent patchwork of decisions upholding or striking laws depending on whether the regulated activities were perceived by the court as being traditionally associated with state or local government or constituting "attributes of state sovereignty." Thus, a significant number of laws imposing costs on state and local governments survived Tenth Amendment scrutiny even before the decision in *Garcia* v. *San Antonio Metro. Transit Auth., supra.* (See, e.g., *EEOC* v. *Wyoming* (1983) 460 U.S. 226 [75 L.Ed.2d 18, 103 S.Ct. 1054] [holding state and local government employee retirement policies subject to federal age discrimination regulations]; see generally, Skover, *"Phoenix Rising" and Federalism Analysis* (1986) 13 Hastings Const.L.Q. 271, 286-288.) More importantly, however, I see no reason to assume that the drafters of article XIII B intended that the federal mandate exemption would have broad application, encompassing a large number of federal programs. Rather, construing the exemption narrowly seems entirely consistent with the probable intent of those who drafted the provision.

The test proposed by the majority for identifying those incentive programs which qualify as "mandates of ... the federal government" will require an extensive factual inquiry into the practical consequences of noncompliance with the federal law. It will be burdensome to apply and its outcome will be difficult to predict. Besides being wholly unnecessary to resolution of this case, and violating the probable intent of the voters who enacted article XIII B of the California Constitution,[1] the majority's discussion of the federal mandate issue is certain to generate more difficulties than it resolves.

---

[1] Those voters no doubt will be upset to learn that their tax dollars will be dissipated in litigation to determine such metaphysical questions as whether a decision to participate in a federal program was "truly voluntary."