Filed 9/25/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MICHAEL D. MYERS, | B255445 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS143436) |
| v. | |
| STATE BOARD OF EQUALIZATION et al., | |
| Defendants and Respondents. | |
| CALIFORNIA PHYSICIANS' SERVICE et al., | |
| Real Parties in Interest and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County,

Jane L. Johnson, Judge. Reversed.

Ajalat, Polley, Ayoob & Matarese and Richard J. Ayoob; Gianelli & Morris,

Robert S. Gianelli and Timothy J. Morris for Plaintiff and Appellant.

Adam M. Cole and Teresa R. Campbell for Defendant and Respondent Dave

Jones, California Insurance Commissioner.

Hogan Lovells, Vanessa O. Wells, Victoria C. Brown and Rachel A. Patta for Real Party in Interest and Respondent Blue Cross of California.

Manatt, Phelps & Phillips, Gregory N. Pimstone, Ronald B. Turovsky and Joanna S. McCallum for Real Party in Interest and Respondent California Physicians' Service.

Carol L. Ventura, Drew Brereton, and Sheila F. Gonzalez, for California Department of Managed Health Care as Amicus Curiae on behalf of Real Parties in Interest and Respondents California Managed Health Care and Blue Cross of California.

---

**INTRODUCTION**

Article XIII, section 28 of the California Constitution imposes a tax of 2.35 percent on the amount of *gross* premiums received each year by "each *insurer* doing business in this state" (Cal. Const., art. XIII, § 28, subd. (b), italics added; *id.*, subds. (c) & (d).)  The tax differs from the corporate franchise tax imposed on all other businesses, which is calculated on the basis of the business's "*net* income."  (Rev. & Tax. Code, § 23151, subd. (f), italics added.)

The issue in this appeal is whether California Physicians' Service, doing business as Blue Shield of California (Blue Shield), and Blue Cross of California, doing business as Anthem Blue Cross (Blue Cross; collectively, Real Parties) are "insurers" under the California Constitution's gross premium tax provision.

A taxpayer brought a mandamus action to compel state officials to collect the gross premium tax from Real Parties.  Real Parties contended, inter alia, they could not, as a matter of law, be regarded as "insurers" under the Constitution's gross premium tax provision, because they are "health care service plans" under the Knox-Keene Health Care Service Plan Act of 1975, Health and Safety Code section 1340 et seq. (the Knox-

2

Keene Act). They argued that regulatory status determines if an entity is an "insurer" and subject to the gross premium tax under the Constitution. The trial court agreed with Real Parties and sustained their demurrers without leave to amend. We reverse, and conclude, pursuant to *People ex rel. Roddis v. California Mut. Assn.* (1968) 68 Cal.2d 677 (*Roddis*), that the taxpayer can maintain this action because the complaint alleges facts sufficient to support an inference that indemnifying against future contingent medical expenses represents a significant financial proportion of Real Parties' businesses.

## FACTS[1] AND PROCEDURAL HISTORY

Plaintiff Michael Myers filed this action against the State Board of Equalization (BOE), the State Insurance Commissioner, and the State Controller (collectively, the State Defendants), to compel the State Defendants to assess and collect the gross premium tax from Real Parties. Plaintiff alleges Real Parties are among the largest health "insurers" in this state by virtue of the significant premiums they collect in exchange for agreeing to indemnify their enrollees against contingent medical expenses, largely through Preferred Provider Organization, or PPO, plans. Despite this, Plaintiff alleges Real Parties have not paid the gross premium tax that is paid by every other company that issues similar fee-for-service indemnity health insurance contracts.

The trial court sustained Real Parties' demurrers to Plaintiff's complaint on three grounds. As for the principal ground, which we address in the major part of this opinion, the court concluded that Real Parties could not, as a matter of law, be regarded as "insurers" under the Constitution's gross premium tax provision, because they are "health care service plans" under the Knox-Keene Act and, as such, are subject to a different regulatory scheme than the one that governs the business of licensed insurance companies in this state. The court also concluded that Plaintiff's action was barred,

---

[1] "Because this matter comes to us on demurrer, we take the facts from [P]laintiff's complaint, the allegations of which are deemed true for the limited purpose of determining whether [P]laintiff has stated a viable cause of action." (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 885.)

under the res judicata doctrine, by a judgment in a prior taxpayer action to compel the BOE to assess and collect the gross premium tax from Blue Cross. Finally, the court determined that Plaintiff lacked standing because the requested relief would effectively enjoin the state from collecting the corporate franchise tax from Real Parties. For the reasons discussed in this opinion, we reject each of these grounds, and reverse the judgment.

1. *Allegations Regarding Blue Shield*

The California Medical Association incorporated Blue Shield in 1939 as a not-for-profit mutual benefit corporation. Blue Shield's founding purpose was to arrange health care for Californians with limited incomes, originally less than $3,000 per year, who did not have adequate funds to pay for medical treatment.

In its early years, Blue Shield contracted directly with California physicians to provide covered medical services to Blue Shield subscribers for a set periodic rate. Under this original model, Blue Shield had no contractual obligation to indemnify its subscribers for medical expenses; rather, the financial risk of providing expensive medical care that exceeded the contracted rate fell entirely upon the treating physicians who had contracted with Blue Shield.

Beginning in the 1960's, Blue Shield expanded its membership and services by removing existing income restrictions and offering health care indemnity contracts that obligated Blue Shield to pay for its members' medical treatment. At the time, state law only required Blue Shield to register with the California Attorney General as a Knox-Mills Act pre-paid health plan, even though the Knox-Mills Act lacked regulatory oversight mechanisms to ensure Blue Shield maintained sufficient reserves to meet its growing indemnity obligations.

In 1975, the Legislature repealed the Knox-Mills Act and enacted the Knox-Keene Act. In 1978, the Department of Corporations designated Blue Shield a California Health Care Service Plan (HCSP)—one of four original licensees under the Knox-Keene Act. As a former Knox-Mills health plan, and in recognition that Blue Shield issued primarily health indemnity contracts, the Department of Corporations

4

permitted Blue Shield to continue to write new fee-for-service indemnity contracts as a HCSP, unlike the vast majority of other HCSPs licensed under the Knox-Keene Act.

Blue Shield utilizes a form of indemnity-based health contract that allows members to obtain covered medical care from "preferred providers" at discounted group rates. Under this arrangement, the hospitals and physicians with whom Blue Shield contracts comprise Blue Shield's Preferred Provider Organization (PPO). Blue Shield members who obtain medical care from preferred providers pay smaller out-of-pocket costs than for medical care received from non-preferred providers, while Blue Shield pays reduced fee-for-service rates for the medical care preferred providers render to Blue Shield members. Consistent with their indemnity structure, the PPO contracts provide that if Blue Shield pays for medical treatment stemming from injuries caused by a third party, then Blue Shield will retain " 'an equitable right to restitution' " to recover the medical costs " 'paid by Blue Shield of California on a fee-for-service basis.' "

Over the last decades, Blue Shield has offered two broad product lines: PPO plans and Health Maintenance Organization (HMO) plans.[2] As of June 2012, Blue Shield reported that 1,824,766 members were enrolled in its PPO plans across California. Blue Shield's PPO membership is approximately twice that of the members

---

[2]     The complaint alleges Blue Shield's HMO plans share some of the indemnity characteristics of its PPO plans. According to the complaint, under most of Blue Shield's HMO plans, Blue Shield contracts with Independent Physician Associations and Medical Groups to provide certain, but not all, outpatient professional medical services. Unlike a traditional capitation arrangement—under which the contracted medical professional receives a fixed fee to provide all medical services to the HMO's members during a covered period, thereby shouldering the risk that the cost of such services will exceed the agreed upon fee—the complaint alleges Blue Shield assumes a share of the financial risk of paying for medical services provided by the contracted Independent Physician Associations and Medical Groups. Further, since Blue Shield does not have capitation agreements with hospitals or pharmacies, the complaint alleges Blue Shield assumes all the financial risk of covering contingent hospital and pharmaceutical charges incurred by its HMO enrollees on a fee-for-service or per diem basis.

5

enrolled in its HMO plans. As of June 2012, Blue Shield's PPO network consisted of 53,710 physicians and 363 hospitals.

PPO plans are customarily characterized as health insurance plans and, as such, are subject to oversight by the Department of Insurance. Like other PPO plans, Blue Shield's PPO contracts are fee-for-service indemnity health contracts that place the financial risk of paying a member's covered contingent medical care costs on Blue Shield, less the required deductible and co-insurance payment by the member. Despite this, while other PPO plans offered in California are subject to regulation by the Department of Insurance, Blue Shield's PPO plans are overseen by the Department of Managed Health Care (DMHC)—Blue Shield's regulator since 1999 under the Knox-Keene Act. In its Final Report of its Routine Medical Survey of Blue Shield of California, dated October 14, 2006, the DMHC disclosed that "[Blue Shield] was permitted the option to include its Preferred Provider Organization (PPO) products under the jurisdiction of the Department of Corporations, the state regulatory agency for the [Knox-Keene] Act at that time."

As of the filing of the complaint, Blue Shield had over 2.8 million enrollees for its PPO and HMO plans, representing the third highest enrollment of all health carriers in California and generating nearly $7 billion in annual premiums or " 'dues.' " In 2012, Blue Shield paid over $5.2 billion for non-capitated medical expenses, representing over three times the amount Blue Shield paid for capitated expenses ($1.7 billion). Figures set forth in the complaint suggest Blue Shield has paid at least two to three times more in fee-for-service medical expenses over the last decade as compared to charges paid under a capitation agreement.

Since 1952, Blue Shield has been exempt from all state franchise tax, including the gross premiums tax, pursuant to findings made by the Franchise Tax Board (FTB) under former Revenue and Taxation Code section 23701.[3] According to the FTB

---

[3] Former Revenue and Taxation Code section 23701, like the current iteration of the statute, provides tax exempt status for certain qualifying nonprofit organizations.

6

opinion letter, Blue Shield's tax-exempt status could be subject to forfeiture in the event "[Blue Shield] change[s] the character of [its] organization, the purposes for which [it] [was] organized, or [its] method of operation."

> 2.  *Allegations Regarding Blue Cross*

Blue Cross was established in 1936 as a not-for-profit hospital service organization. In 1983, Blue Cross implemented one of the first PPO programs in California. Three years later, Blue Cross formed its first HMO plan. In 1996, Blue Cross changed its status to a "for profit" health plan.

Blue Cross was regulated by the Department of Insurance until January 1983, when, through a series of legislative acts, it came under the jurisdiction of the Department of Corporations—the predecessor to Blue Cross's current regulator under the Knox-Keene Act, the DMHC. The same legislative acts deemed Blue Cross a "grandfathered" Knox-Mills pre-paid health plan and enabled Blue Cross, like Blue Shield, to continue issuing health plans with an indemnity component even after the DMHC assumed regulatory jurisdiction.[4]

Blue Cross PPO plans provide coverage for doctor office visits, hospital stays, emergency medical treatment, medical diagnostic services, outpatient services, prescription drugs and other medical benefits. The amounts Blue Cross pays under its PPO contracts are dependent upon coinsurance and deductable options and whether the medical care is provided by a Blue Cross "in-network" physician or a hospital that charges a lower "volume discount" rate negotiated by Blue Cross. Blue Cross PPO plans also provide coverage for more costly out-of-network medical treatment.

---

[4]     In support of this allegation, the complaint cites Health and Safety Code section 1396.5, which provides, "A nonprofit hospital corporation which substantially indemnified subscribers and enrollees and was operating in 1965 under Chapter 11A (commencing with Section 11490) of Part 2 of Division 2 of the Insurance Code and which is regulated under the Knox-Keene Health Care Service Plan Act shall enjoy the privileges under the act which would have been available to it had it been registered under the Knox-Mills Health Plan Act and applied for a license under the Knox-Keene Health Care Service Plan Act in 1976." For purposes of reviewing the judgment, we will assume the statute applied to Blue Cross.

7

The complaint alleges on information and belief that Blue Cross issues more PPO plans in California than any other HCSP or insurance company in the state, and that more Blue Cross members receive benefits under its PPO products than its HMO products. The complaint also alleges on information and belief that Blue Cross, like Blue Shield, was given the option to have the Department of Corporations oversee its PPO plans, rather than the Department of Insurance, which oversees all other PPO health insurance plans issued in California.

Blue Cross financial statements from 2002 through 2012 show Blue Cross's annual fee-for-service payments on behalf of its members have been approximately five to six times larger than its pre-paid capitation payments to healthcare providers over the subject decade. In 2012, Blue Cross's fee-for-service payments totaled more than $7.2 billion, as compared to the $1.8 billion in fixed fees it paid pursuant to capitation agreements with physicians and hospitals. Since 1983, when Blue Cross came under the jurisdiction of the Department of Corporations pursuant to the Knox-Keene Act, Blue Cross has not paid any gross premium taxes.

3. *The 2004 Lawsuit*

In November 2004, the Foundation for Taxpayer and Consumer Rights (FTCR) and Shari Rosenman (collectively, the FTCR plaintiffs) filed a taxpayer action pursuant to Code of Civil Procedure section 526a[5] against the BOE, the State Controller and the State of California. The complaint sought declaratory and injunctive relief to compel "the assessment and collection of hundreds of millions of dollars in unpaid gross premium taxes owed to the State of California by [Blue Cross] on the premiums it receives from its [PPO] health insurance plan subscribers" (the 2004 Lawsuit).

---

[5]     Code of Civil Procedure section 526a provides in relevant part: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein."

The FTCR plaintiffs alleged the "PPO plans sold by Blue Cross are a type of indemnity health insurance" and that approximately 41 percent of Blue Cross's health insurance business in California was attributable to its PPO products. At all relevant times, however, Blue Cross allegedly paid the franchise tax on its net profits, not the constitutionally-mandated gross premium tax paid by other health insurers selling PPO indemnity insurance products. This allegedly allowed Blue Cross to reap "an enormous competitive advantage" over other health insurers in California. As the FTCR plaintiffs asserted in their complaint, "[a]lthough the franchise tax rate of 8.83% is greater than the premium tax rate of 2.35%, because the base for the gross premium tax is gross premiums instead of net income, the gross premium tax collects a greater share of an insurance company['s] premium revenue than is proportionally collected from a health plan by the franchise tax." The FTCR plaintiffs maintained that the relief sought would "level the playing field for all California health insurers and result in a more competitive and fair environment for health care insurers."

The public entity defendants and Blue Cross, as a real party in interest, filed demurrers to the FTCR plaintiffs' complaint. The demurrers argued (1) the plaintiffs lacked standing under Code of Civil Procedure section 526a because the relief sought would effectively enjoin the FTB from collecting the franchise tax from Blue Cross; and (2) the public entity defendants had no duty to collect the gross premium tax because Blue Cross was a HCSP under the Knox-Keene Act and, therefore, not an "insurer" under Article XIII, section 28 of the Constitution.

The trial court sustained the demurrers without leave to amend. With respect to the constitutional issue, the court concluded Blue Cross was not an "insurer" under Article XIII, section 28. Citing the fact that "[i]nsurers are registered with and regulated by the Insurance Commissioner and Department of Insurance," while Blue Cross had been licensed as a HCSP under the Knox-Keene Act since 1993, the court reasoned that the Legislature and relevant state agencies, including the Department of Insurance, the DMHC, and the FTB, had determined that Blue Cross was a health plan and not an insurer for tax purposes. Because, in the court's view, these agencies made

9

"discretionary policy determinations" with respect to Blue Cross's status, the court concluded such determinations were "not subject to judicial review by means of a taxpayer action." Accordingly, the court held Blue Cross's status as a licensed HCSP was dispositive and barred declaratory or injunctive relief compelling the public entity defendants to assess and collect the gross premium tax from Blue Cross.

While acknowledging the demurring parties' argument that the FTCR plaintiffs' action could not be maintained under Code of Civil Procedure section 526a because it would necessarily enjoin the FTB from collecting the franchise tax, the trial court applied a different analysis to the standing issue. The court reasoned that a taxpayer has standing under Code of Civil Procedure section 526a to compel the collection of a tax only if the subject public agencies have "nondiscretionary duties that required the collection of those funds." Working from that premise, the court settled on the same rationale that it employed to resolve the constitutional issue--that is, because the relevant agencies made a discretionary policy determination to characterize Blue Cross as a HCSP, and HCSPs are not subject to the gross premium tax, the court concluded the FTCR plaintiffs had no standing to compel the public entity defendants to collect the gross premium tax.

The FTCR plaintiffs appealed from the judgment, but then abandoned the appeal before submitting the case to the appellate court for a decision.

4.      *The Instant Action*

In July 2013, Plaintiff filed the instant action, styled as a verified petition/complaint for writ of mandamus and declaratory judgment, against the State Defendants. The complaint sought to compel the State Defendants to "perform their respective ministerial duties mandated by the California Constitution and Revenue and Taxation Code . . . regarding the determination, assessment, and collection of the gross premium tax" with respect to Real Parties. The complaint also sought a declaratory judgment determining "whether Blue Shield and Blue Cross are 'insurers' as that term is used within Article XIII, section 28 of the California Constitution." Plaintiff asserted

10

he had standing to sue for the requested relief pursuant to Code of Civil Procedure section 526a.

The complaint's central theory for relief is that Real Parties' PPO products are indemnity health insurance contracts and, because these indemnity products represent the vast majority of Real Parties' business in the state, the complaint asserts Real Parties are "insurers" under the Constitution and the premiums they collect in California are subject to the gross premium tax. Despite this, the complaint alleges the State Defendants have failed to perform their ministerial duty to assess and collect the gross premium tax from Real Parties. That failure, the complaint asserts, "constitutes a waste of tax monies owed to the state warranting mandamus."

After the trial court related the instant action to the 2004 Lawsuit filed by the FTCR plaintiffs, the parties filed a joint initial status conference statement setting forth their respective positions on the core factual and legal issues presented by the complaint's allegations. The BOE stated it had "no position" regarding Plaintiff's entitlement to relief, observing that under the relevant Revenue and Taxation Code provision the BOE's duty to assess the gross premium tax is "under the direction of the Department of Insurance and purely ministerial." The Controller similarly stated that it "makes no determination as to whether entities, such as [Real Parties], are insurers for purposes of administering [the gross premium tax]." The Controller added, "This determination is made by the Insurance Commissioner." As for the Insurance Commissioner, he stated: "The core legal issue is whether [Real Parties] are insurers

11

subject to gross premium tax under California Constitution article XIII, section 28.  The Commissioner contends the answer is yes."**6**

Real Parties filed separate demurrers to the complaint.  Both demurrers asserted the judgment in the 2004 Lawsuit barred the instant action under the res judicata doctrine and that, on the merits, Real Parties' status as a licensed Knox-Keene HCSP regulated by the DMHC—not the Insurance Commissioner—conclusively established they were not "insurers" subject to the gross premium tax.  Blue Cross also argued, as it had in the 2004 Lawsuit, that Plaintiff lacked standing under Code of Civil Procedure section 526a because the relief he sought would effectively enjoin the FTB from collecting franchise tax from Blue Cross.  Blue Shield also challenged Plaintiff's standing, but argued it was lacking with respect to the relief affecting Blue Shield because such relief—a writ of mandate compelling the State Defendants to collect gross premium taxes from Blue Shield—was inconsistent with Blue Shield's tax-exempt status.

Plaintiff opposed the demurrers, arguing, among other things, that (1) the requisite elements of res judicata were not present, but even if they were, the court should invoke the doctrine's public interest exception in view of the public revenue component and constitutional dimension of the claims; (2) the Real Parties' regulatory designation under the Knox-Keene Act could not trump the State Defendants' constitutionally-mandated ministerial duty to collect the gross premium tax from entities substantially engaged in the business of selling indemnity insurance in California; and

---

**6**     The BOE and Controller each filed answers reaffirming that their ministerial duties with respect to assessing the gross premium tax were dictated by the Insurance Commissioner.  The Insurance Commissioner stated in his answer that Article III, section 3.5 of the Constitution precludes him from declaring a statute unenforceable or refusing to enforce a statute on the basis of it being unconstitutional without an appellate court determination.  Accordingly, the Insurance Commissioner stated he must give deference to the relevant provisions of the Insurance Code and Health and Safety Code deeming Real Parties to be HCSPs.  He added, however, that he "contends those statutes are unconstitutional to the extent they immunize [Real Parties] from premium tax."

12

(3) Real Parties' standing arguments were based on flawed interpretations of the relevant legal authorities.

The trial court sustained Real Parties' demurrers without leave to amend. The court determined that all elements for invoking res judicata were present and declined to apply the public interest exception, observing "this case deals with questions of economic public policy [that] do not lie within this Court's prerogative." The court also determined that Real Parties' regulatory designation under the Knox-Keene Act was dispositive and precluded a finding that Real Parties were "insurers" subject to the gross premium tax under the Constitution. Finally, the court concluded Plaintiff lacked standing under Code of Civil Procedure section 526a, reasoning that the gross premium tax is " 'in lieu of' " other taxes and, therefore, the relief requested by Plaintiff would " 'inherently enjoin collection of the corporate franchise tax paid by Blue Cross.' "

## DISCUSSION

1.      *Taxation of Insurance Companies in California*

Before we address the issues in this case, we must place this matter in context by examining the specific taxing scheme for insurers that lies at the heart of this controversy. In California, insurance companies are taxed differently than other corporations doing business in the state. While regular corporations are subject to a corporate franchise tax of 8.84 percent, calculated on the basis of the corporation's "*net* income" (Rev. & Tax. Code, § 23151, subd. (f), italics added),[7] the California Constitution imposes a tax of 2.35 percent on the amount of *gross* premiums received each year by "each *insurer* doing business in this state" (Cal. Const., art. XIII, § 28, subd. (b), italics added; *id.*, subds. (c) & (d).) For most types of insurers, this tax is in lieu of all other taxes and fees payable to the state, except property taxes and vehicle license fees. (*Id.*, subd. (f).) Thus, insurance companies do not pay tax on other forms of income, such as investment income, and income earned from other trades or

---

[7]      Banks and financial corporations, and Subchapter S corporations, are subject to different tax rates on their net income. (See Rev. & Tax. Code, §§ 23186, 23802.)

13

businesses.  (See *Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 410 ["the 'in lieu' provision was intended to preclude the state or any of its subdivisions from exacting any other revenue from the specified corporations (except local taxes on real estate) and was granted in exchange for the payment of a tax on gross, rather than net, premiums, and at an adjustable rate higher than would otherwise be applied"].)

A July 2008 report by the Legislative Analyst's Office observes that "[t]he economics of the insurance industry is a key reason for the special treatment of insurance companies" with respect to taxation in California.  The report explains the rationale as follows:  "Most [corporate franchise tax] taxpayers calculate their income by subtracting costs incurred in the production of a good or service from the revenues received from their sale.  Insurance companies, by contrast, collect their revenues up front [in the form of premiums], then make payments to policyholders based on contingent events that occur many months or years later.  Thus, it can be difficult to 'match up' revenues to related expenses.  In an income tax framework, insurers ideally would be allowed to deduct the current value of all future obligations (claims) covered by the insurance policies they have written when calculating their taxable income for a given year.  [However,] [b]ecause the actual amount of these obligations is uncertain, as are the amount of investment earnings on accumulated premiums received during the intervening period, an accurate determination of the theoretically appropriate amount of taxable income proves very difficult to achieve in practice."  "For this reason," the Legislative Analyst's Office report concludes, "a [gross] premiums tax was adopted."

2.      *Knox-Keene Licensed Health Care Service Plans*

The other leg of this controversy concerns the regulatory regime applicable to licensed HCSPs under the Knox-Keene Act.  Again, some background in this area is necessary to put our resolution of the parties' opposing positions in context.

In 1975, the Legislature adopted the Knox-Keene Act with the express intent and purpose to "promote the delivery and the quality of health and medical care to the people of the State of California who enroll in, or subscribe for the services rendered by, a [HCSP] by accomplishing all of the following:  [¶] (a) Ensuring the continued role of

14

the professional as the determiner of the patient's health needs . . . . [¶] (b) Ensuring that subscribers and enrollees are educated and informed of the benefits and services available . . . . [¶] (c) Prosecuting malefactors who make fraudulent solicitations or who use deceptive methods . . . . [¶] (d) Helping to ensure the best possible health care for the public at the lowest possible cost by transferring the financial risk of health care from patients to providers. [¶] (e) Promoting effective representation of the interests of subscribers and enrollees. [¶] (f) Ensuring the financial stability thereof by means of proper regulatory procedures. [¶] (g) Ensuring that subscribers and enrollees receive available and accessible health and medical services rendered in a manner providing continuity of care. [¶] (h) Ensuring that subscribers and enrollees have their grievances expeditiously and thoroughly reviewed by the [DMHC]." (Health & Saf. Code, § 1342.)

In relevant part, the Knox-Keene Act defines those HCSPs that are subject to the law's regulations as "Any person who undertakes to arrange for the provision of health care services to subscribers or enrollees, or to pay for or to reimburse any part of the cost for those services, in return for a prepaid or periodic charge paid by or on behalf of the subscribers or enrollees." (Health & Saf. Code, § 1345, subd. (f).) HCSPs as defined in and regulated by the Knox-Keene Act are under the jurisdiction of the DMHC. (Health & Saf. Code, § 1341.) Though such entities are authorized to provide direct payment or reimbursement coverage for their enrollees' medical expenses, HCSP's are statutorily exempted from the Insurance Department's jurisdiction, and are not subject the Insurance Code's regulations. (Ins. Code, § 740, subd. (g).) This exemption extends to HCSPs offering fee-for-service coverage through a PPO plan. (*Id.*, § 742.)

Finally, because HCSPs include, by definition, entities that agree to "pay for or to reimburse" enrollees for the cost of medical services in exchange for a "prepaid or periodic charge" (Health & Saf. Code, § 1345, subd. (f)(1)), the Knox-Keene Act includes capitalization requirements and vests financial oversight authority in the DMHC. (*Id.*, §§ 1376, 1377, & 1399, subd. (c).)

15

3. *The Complaint Alleges Sufficient Facts to Find Real Parties Are*
*"Insurers" under the Gross Premium Tax Provision of the Constitution*

With the forgoing background, we can distill the novel constitutional question presented by this appeal as follows: Are allegations that Real Parties receive a substantial share of their annual premiums in exchange for agreeing to indemnify enrollees against contingent medical expenses sufficient to state a claim that Real Parties are "insurer[s]" subject to the Constitution's gross premium tax? We hold the answer is yes, because these allegations support an inference that indemnifying against future contingent claims represents a significant financial proportion of Real Parties' businesses as balanced against the health care service aspect of their businesses. Accordingly, we conclude the trial court erred in sustaining Real Parties' demurrers.

To reiterate, the Constitution imposes the gross premiums tax on "each *insurer* doing business in this state" (Cal. Const., art. XIII, § 28, subd. (b), italics added; *id.*, subds. (c) & (d).) In relevant part, the Constitution defines the term " 'Insurer' " to "include[ ] insurance companies or associations and reciprocal or interinsurance exchanges." (Cal. Const., art XIII, subd. (a).) The definition, by its use of the word "includes," is not restrictive, and our Supreme Court has looked outside the Constitution, to definitions provided by the Insurance Code, for guidance in assessing the scope of the gross premium tax provision. (See, e.g., *Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649, 654 (*Metropolitan Life*); *Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 725.)

16

As the court observed in *Metropolitan Life*, "[t]he Legislature has defined insurance as 'a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event.' " (*Metropolitan Life, supra,* 32 Cal.3d at p. 654, quoting Ins. Code, § 22.) "The person who undertakes to indemnify another by insurance is the insurer, and the person indemnified is the insured." (Ins. Code, § 23; see *Metropolitan Life,* at p. 654.) Under these definitions, "insurance necessarily involves two elements: (1) a risk of loss to which one party is subject and a shifting of that risk to another party; and (2) distribution of risk among similarly situated persons." (*Metropolitan Life,* at p. 654, citing *California Physicians' Service v. Garrison* (1946) 28 Cal.2d 790, 803-804.)

Plaintiff contends the complaint's allegations demonstrate that Real Parties are "insurers" under the Constitution's gross premium tax provision, notwithstanding that Real Parties are statutorily designated as HCSPs for regulatory purposes. In support of this contention, Plaintiff relies upon our Supreme Court's opinion in *Metropolitan Life.* There, the court recognized that the gross premium tax's purpose is to "exact payments from insurers doing business in California" by "approximat[ing] the volume of business done in this state, and thus the extent to which insurers have availed themselves of the privilege of doing business in California." (*Metropolitan Life, supra,* 32 Cal.3d at p. 656.) And, for this purpose, the Supreme Court stressed that we must "look beyond the formal labels the parties have affixed to their transactions and seek, rather, to discern the true economic substance" of the arrangement. (*Id.* at pp. 656-657.)

As for the complaint's allegations, Plaintiff emphasizes that Real Parties receive a substantial portion of their premiums each year in exchange for agreeing to indemnify their enrollees against a risk of loss occasioned by contingent medical expenses, and in doing so, Real Parties' contracts effectively spread the financial risk posed by those contingent medical events among the millions of Californians who pay premiums to enroll in Real Parties' PPO plans. Specifically, the complaint alleges Blue Shield paid over $5.2 billion for indemnity claims in 2012, as compared to $1.7 billion for non-indemnity based claims, and Blue Cross paid over $7.2 billion for indemnity claims, as

17

compared to $1.8 billion for non-indemnity based claims. Plaintiff contends application of the gross premium tax must be determined by examining Real Parties' "business activity" in the state—not simply their regulatory status—and the complaint's allegations support the claim that Real Parties operate as "insurers" for purposes of imposing the Constitution's gross premium tax.

Plaintiff contends this is a factual issue, which the trial court improperly resolved on demurrer by drawing unwarranted inferences from Real Parties' regulatory obligations. Rather than resolve the issue based solely on regulatory status, Plaintiff argues the trial court should have applied the test set forth in *Roddis* to assess whether the complaint's allegations concerning Real Parties' business activities supported the claim that they are "insurers" under the Constitution's gross premium tax provision. Because *Roddis* supplies a legal standard against which Plaintiff's allegations may be measured, we will review the case in some depth.

In *Roddis*, the Insurance Commissioner brought suit to restrain California Mutual Association (CMA) from "carrying on business as an insurer without first securing a certificate of authority pursuant to Insurance Code section 700." (*Roddis, supra,* 68 Cal.2d at p. 678.) CMA, which contracted with doctors who agreed to render services to CMA's dues paying members and to look exclusively to CMA for payment of a scheduled fee (*id.* at pp. 678-679.), claimed it was a "health care service plan" under the Knox-Mills Act—the predecessor to Knox-Keene. The *Roddis* court explained: "If CMA is an insurer then it is subject to the supervision of the Insurance Commissioner and it must provide paid-in capital (Ins. Code, § 700.01), and a surplus (Ins. Code, § 700.02) and pay premium taxes. If, as CMA contends, it is a 'health care service plan' pursuant to the Knox-Mills Plan Act (Gov. Code, §§ 12530-12539), then it is subject to the supervision of the Attorney General and need not meet any statutory financial responsibility requirements," as no provisions existed in the Knox-Mills Act to assure the financial solvency of health care service plans. (*Roddis,* at p. 679.)

The *Roddis* court began its analysis with the Knox-Mills Act's statutory language, which defined "a 'health care service plan' as any organization 'whereby any person undertakes responsibility to provide, arrange for, pay for or *reimburse* any part of the cost of any health care service for a consideration consisting in part of prepaid or periodic charges; but the provisions of this article shall not apply to such a plan operated by an *insurer. . . .*' " (*Roddis, supra,* 68 Cal.2d at p. 680.) While the Knox-Mills Act did not define the term "insurer," the court noted "[i]nsurance necessarily involves the element of indemnity." (*Ibid.*) Thus, the court reasoned, the extent of indemnity offered by the entity represented the critical dividing line between whether an entity was a "health care service plan" or "insurer" under the Knox-Mills Act. As the court explained, "The [Knox-Mills Act] permits a health care service plan to 'reimburse' a member and thus indicates that service plans may include some indemnity features, but by excluding an 'insurer' from the definition of a 'health care service plan' the Legislature has evinced an intention to limit the extent of indemnity features permissible. It is this limit we must now determine." (*Id.* at p. 681.)

To determine this limit (and thus ascertain the proper regulatory characterization of an entity claiming to be a Knox-Mills health care service plan) the *Roddis* court observed "two policy considerations" must drive the analysis. (*Roddis, supra,* 68 Cal.2d at p. 682.) First, the court explained, "[w]here indemnity features are present, the member bears the risk of personal liability for medical services. This is the insurance risk which can be protected against by financial reserves to assure that the member will receive the benefits for which he has paid." (*Ibid.*) As for the second consideration, the court emphasized, "there is a strong social policy to encourage the services which health plans provide the public," and the Insurance Code's financial reserve requirements should not inhibit the development of health plans to meet that need. (*Id.* at pp. 682-683.)

Cognizant of these two policies, the *Roddis* court concluded that "where indemnity is a significant financial proportion of the business, the organization must be classified as an 'insurer' for the purposes of the Knox-Mills Plan Act." (*Roddis, supra,* 68 Cal.2d at p. 683.) The court acknowledged that "this determination involves balancing the indemnity aspects against the direct service aspects of the business," and admonished that "only in the context of the plan as a whole can it be determined whether the indemnity feature is so significant as to warrant imposing the Insurance Code financial reserve requirements." (*Ibid.*) In that regard, the court emphasized, "[h]ealth care service plans were given special legislative treatment because of the direct service feature. Only so long as the plans pursue and achieve that objective is the public assured that the protection of the Insurance Code is not necessary." (*Ibid.*)

We conclude *Roddis* provides the appropriate standard for determining whether an entity should be regarded as an "insurer" for purposes of assessing the gross premium tax under article XIII, section 28 of the Constitution. We acknowledge the critical role that financial solvency concerns played in the Supreme Court's formulation of the *Roddis* test; however, for purposes of assessing whether an entity is an "insurer" under the Constitution's gross premium tax provision, we regard this as a distinction without difference. In *Roddis*, the court's concern over financial solvency stemmed from the fact that CMA had promised to pay for future contingent medical expenses, yet its ultimate liability for such expenses was unknown at the time it collected dues from its covered members. The same concern supported adoption of the gross premium tax. According to the Legislative Analyst's Office, the economics of insurance indemnity arrangements—that is, the fact that insurers receive premiums up front, without knowing what related expenses will be paid on those premiums in the future, thereby rendering them unable to determine the net profits attributable to those premiums at the end of the tax year—was the "key reason" for adopting the gross premium tax. The *Roddis* test, which focuses on whether "indemnity is a significant financial proportion of the business" (*Roddis, supra,* 68 Cal.2d at p. 683), is suitably calibrated to this unique aspect of the insurance industry.

Further, in *Metropolitan Life* our Supreme Court observed that the gross premium tax's purpose is to "exact payments from insurers doing business in California" by "approximat[ing] the volume of business done in this state, and thus the extent to which insurers have availed themselves of the privilege of doing business in California." (*Metropolitan Life, supra,* 32 Cal.3d at p. 656.) For this purpose, the court mandated that we "look beyond the formal labels the parties have affixed to their transactions and seek, rather, to discern the true economic substance" of the arrangement. (*Id.* at pp. 656-657.) Thus, contrary to Real Parties' contention, it is not determinative that Real Parties are designated as HCSPs for regulatory purposes. Under *Metropolitan Life*, the court must look beyond this regulatory label to the true economic substance of Real Parties' business operations to determine whether those operations are such that the gross premium tax best approximates the extent to which Real Parties have availed themselves of the privilege of doing business in California. Insofar as the complaint alleges Real Parties' business operations consist predominately of selling and administering indemnity based health insurance policies, it is reasonable to conclude that the gross premium tax best captures the volume of business Real Parties conduct in this state, notwithstanding their regulator labels.

As discussed, the underlying reason for this state's adoption of the gross premium tax was to simplify the taxation of insurance companies that, in contrast to other businesses, have difficulty calculating their net profits in a given tax year because they collect revenues up front in the form of premiums, then make indemnity payments to policyholders based on contingent events that occur many months or years later. The complaint's allegations support a reasonable inference that Real Parties' business operations raise similar difficulties with respect to taxation of their net profits—that is, under Real Parties' PPO policies they collect premiums up front, but do not make payments on the policies unless and until a contingent medical event occurs. Thus, because a significant financial portion of Real Parties' business operations allegedly consist of indemnity contracts, the underlying rationale for applying the gross premium tax to other insurance companies applies equally to Blue Cross and Blue Shield.

21

Guided by *Roddis*, *Metropolitan Life*, and the underlying purpose of the gross premium tax, we conclude the complaint's allegations concerning the proportion of annual payments Real Parties made pursuant to their PPO plans are sufficient to support the requested mandamus relief. The complaint alleges Blue Shield paid over $5.2 billion for indemnity based medical expenses in 2012, as compared to $1.7 billion for non-indemnity based expenses. Similarly, the complaint alleges Blue Cross paid over $7.2 billion for indemnity based medical expenses in 2012, as compared to $1.8 billion for non-indemnity expenses. Under the *Roddis* test, Plaintiff has adequately stated a claim that Real Parties should be regarded as "insurers" for the purpose of assessing the gross premium tax. The trial court erred in sustaining Real Parties' demurrers on this basis.

4. *The Public Interest Exception to Res Judicata Applies*

Having resolved the novel constitutional issue, we turn to the trial court's other grounds for sustaining Real Parties' demurrers. As an independent ground for sustaining Real Parties' demurrers, the trial court found that the judgment in the 2004 Lawsuit by the FTCR plaintiffs barred the instant action under the doctrine of res judicata. Plaintiff maintains that the elements for imposing the res judicata bar are not present, but even if they were, he should be allowed to maintain this action under the doctrine's public interest exception. We agree that the exception applies.

In *City of Sacramento v. State of California* (1990) 50 Cal.3d 51, our Supreme Court formulated the public interest exception as follows: " '[W]hen the issue is a question of law rather than of fact, the prior determination is not conclusive either if injustice would result or if the public interest requires that relitigation not be foreclosed. [Citations.] . . . .' " (*Id.* at p. 64.) The *City of Sacramento* court concluded that the public interest exception applied to allow relitigation of an issue concerning whether costs expended by local governments for mandatory unemployment coverage must be reimbursed by the state pursuant to article XIII B of the Constitution. (*City of Sacramento,* at pp. 57, 64-65.) In applying the exception, the court emphasized that "[w]hether [such] costs are reimbursable under article XIII B . . . constitutes a pure

22

question of law" and, because the issue concerned public finances, "the consequences of any error transcend those which would apply to mere private parties." (*City of Sacramento,* at p. 64.) Under those circumstances, the court held res judicata could not be invoked to "permanently foreclose" the court from examining the issue. (*Id.* at p. 65.)

In *Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, the Supreme Court applied the public interest exception to permit a second lawsuit regarding the constitutionality of a state statute permitting school districts to charge students for transportation. (*Id.* at pp. 256-259.) Among the considerations that compelled application of the exception, the court cited the fact that it ordered the appellate decision in the prior action depublished, which fostered "demonstrable uncertainty" about the statute's validity. (*Id.* at p. 257.) And, as a practical matter, the court observed applying the res judicata bar would mean the constitutionality of the statute would never again be litigated, in which case "there would be *no opportunity* for anyone *ever* to challenge the legal grounds of the unpublished ruling." (*Id.* at p. 258.) Stressing that the matter involved "a pure question of law," which "affects the public in general," the court held the public interest exception applied. (*Id.* at p. 259.)

As in *City of Sacramento* and *Arcadia Unified School Dist.*, the trial court in the 2004 Lawsuit determined the applicability of the Constitution's gross premium tax as a pure question of law. Also like those cases, the prior determination concerned a matter affecting public finances and, by extension, the interests of the public at large. The payment of taxes is always important to the public welfare; indeed, it is vital to the existence of the public services government provides. (See *State Bd. of Equalization v. Superior Court* (1985) 39 Cal.3d 633, 639.) Were the trial court's prior decision to act as a bar to future taxpayer suits, there would be no appellate guidance for the relevant state agencies concerning this important fiscal issue. For these reasons, we conclude the public interest exception applies.

5. *The Action Does Not Enjoin the Collection of Tax*

Lastly, in sustaining Real Parties' demurrers, the trial court reasoned that the relief requested by Plaintiff would necessarily enjoin the state from collecting the corporate franchise tax from Real Parties, because the gross premium tax is imposed on insurers "in lieu of" the corporate franchise tax. (Cal. Const., art. XIII, § 28, subd. (f).) And, because an action to enjoin the collection of taxes is barred by the Constitution, the court concluded Plaintiff lacked standing to pursue such relief under Code of Civil Procedure section 526a. The ruling misapprehends the relevant authorities.

Code of Civil Procedure section 526a authorizes a taxpayer to bring an action against public officers to "obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state." While the statutory language refers to a prohibitory injunction, it is well-settled that taxpayers have standing under section 526a to seek mandamus relief to compel government officials to comply with a mandatory duty. As the court stated in *Vasquez v. State of California* (2003) 105 Cal.App.4th 849 (*Vasquez*), "It is established that an action lies under section 526a not only to enjoin wasteful expenditures, but also to enforce the government's duty to collect funds due the State." (*Vasquez*, at p. 854.)

Article XIII, section 32, of the Constitution, provides: "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature." Thus, under the Constitution, a taxpayer is not permitted to pursue an action to enjoin an allegedly illegally assessed tax (under Code of Civil Procedure section 526a or otherwise); rather, the taxpayer's remedy is to pay the assessed tax and then commence an action for its refund. (See *Pacific Gas & Electric Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 277, 284.) "The policy behind [Article XIII, section 32, of the Constitution] is to allow revenue

24

collection to continue during litigation so that essential public services dependent on the funds are not unnecessarily interrupted." (*Id.* at p. 283.)

As noted, Code of Civil Procedure section 526a authorizes a taxpayer action to "enforce the government's duty to collect funds due the State." (*Vasquez, supra,* 105 Cal.App.4th at p. 854.) Plaintiff's action seeks mandamus relief to command the State Defendants to assess and collect the gross premium tax from Real Parties, it does not seek to enjoin the state from collecting any other taxes or fees. Whatever effect the "in lieu of" clause of the gross premium tax provision has on the corporate franchise taxes the state has previously collected from Real Parties is a matter for Real Parties to raise in a subsequent tax refund action. It has no effect on Plaintiff's standing under Code of Civil Procedure section 526a to prosecute the current action.

## *DISPOSITION*

The judgment is reversed and the order sustaining Real Parties' demurrers is vacated.  Plaintiff Michael D. Myers is entitled to costs.

**CERTIFIED FOR PUBLICATION**

                                        KITCHING, Acting P. J.

We concur:


                ALDRICH, J.


                JONES, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.